## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

In re:                                              :
                                                    :
NORVERGENCE, INC.                                   :        CASE NO. 04-32079 (RG)
                                                    :        Chapter 7
              Debtor.                               :
                                                    :
                                                    :
―――――――――――――――――――                                 :
                                                    :
WANLAND AND ASSOCIATES INC.                         :
Individually and on behalf of all others           :
similarly situated.                                 :
                        Plaintiff,                  :
                                                    :
vs.                                                 :
                                                    :
                                                    :
NORTEL NETWORKS LIMITED,                            :        ADV. NO. 05-2439 (RG)
NORTEL NETWORKS INC., QWEST                         :
COMMUNICATIONS INTERNATIONAL                        :
INC., THOMAS N. SALZANO,                            :
ALEXANDER L. WOLF and                               :
ROBERT J. FINE                                      :
                                                    :
                        Defendants.                 :
                                                    :        **OPINION**

**FILED**
JAMES J. WALDRON, CLERK
FEB 28 2008
U.S. BANKRUPTCY COURT
NEWARK, N.J.
BY _____ DEPUTY

Before:      HON. ROSEMARY GAMBARDELLA, U.S.B.J.

<u>APPEARANCES:</u>

TRUJILLO RODRIGUEZ AND RICHARD LLP
8 Kings Highway West
Haddonfield, New Jersey 08033
By:    Lisa J. Rodriguez, Esq.
Attorney(s) for Plaintiff, Wanland & Associates, Inc.

MILLER FAUCHER & CAFFERTY LLP
One Logan Square
18th and Cherry Streets, Suite 1700
Philadelphia, PA 19103
By:    William R. Kane, Esq.
Attorney(s) for Plaintiff, Wanland & Associates, Inc.

RIKER DANZIG SCHERER HYLAND & PERRETTI LLP
Headquarters Plaza
1 Speedwell Avenue
Morristown, New Jersey 07962
By:    Anne M. Patterson, Esq.
Attorney(s) for Defendants Nortel Networks, Ltd. And Nortel Networks, Inc.

CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
By:    Scott L. Winkelman, Esq.
         Jennifer R. Devery, Esq.
Attorney(s) for Defendants Nortel Networks, Ltd. And Nortel Networks, Inc.

SILLS CUMMIS EPSTEIN & GROSS P.C.
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
By:    Jeffrey J. Greenbaum, Esq.
Attorney(s) for Defendant Qwest Communications International, Inc.

SOKOL BEHOT & FIORENZO
Continental Plaza
433 Hackensack Avenue
Hackensack, New Jersey 07601
By     Jospeh B. Fiorenzo, Esq.
Attorney(s) for Defendant Robert J. Fine

<u>Rosemary Gambardella, Bankruptcy Judge</u>

Before the Court is a motion brought on behalf of Nortel Networks, Limited and Nortel

Networks, Inc. ("Nortel Defendants" or "Nortel") to dismiss all claims against Nortel contained in

an amended class action complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) as made applicable

by Fed R. Bankr. P. 7012(b) and 7009.

The amended class action complaint ("Amended Complaint" or "Complaint") was filed by Wanland & Associates, Inc. ("Wanland"), a party to an equipment lease with NorVergence, Inc., the above-captioned debtor (the "Debtor"), and contains allegations that the defendants committed violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1, et seq. ("NJCFA"), and other state consumer fraud protection statutes, as well as negligent misrepresentation and unjust enrichment.  The defendants named in the complaint are the Debtor's alleged corporate business partners, as well as individual defendants.  The Debtor is not a direct party to the adversary proceeding.

Also before this Court is a motion filed by Qwest Communications International, Inc. ("Qwest") to dismiss all claims against Qwest in the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b) made applicable by Fed. R. Bankr. P. 7012(b) and 7009.  The Amended Complaint contains allegations that Qwest, similar to Nortel, violated the NJCFA, and engaged in negligent misrepresentation and unjust enrichment.

Finally, before this Court is also a motion for summary judgment filed on behalf of Defendant Robert J. Fine to dismiss all claims against Fine pursuant to Fed. R. Civ. P. 56(c) made applicable by Fed. R. Bank. P. 7056 .

The Motions have been  opposed by Wanland.  A hearing on the matter was conducted on September 13, 2006, at which time the Court reserved its decision.  The following constitutes this Court's findings of fact and conclusions of law.

STATEMENT OF FACTS

NorVergence, Inc. (the "Debtor"), a reseller of telecommunications services, allegedly induced its customers to enter leases for equipment, also known as equipment rental agreements ("ERAs"), by promising low cost telecommunication services. Specifically, the Debtor's customers entered leases for a device called a "Matrix box." In addition to the ERAs, each customer entered into a separate agreement with the Debtor for the actual provision of telecommunication service. After the Debtor entered these ERAs, the Debtor would sell the agreements to a variety of equipment leasing companies. Ultimately, the Debtor defaulted on its obligation to provide service to its customers. However, because the ERAs had been sold to separate entities and were not contingent on the provision of telecommunication service, the customers remained liable for the payments due under their equipment leases.

On June 30, 2004, an involuntary petition was filed against the Debtor under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[1] See Docket Entry No. 1, Involuntary Petition for Relief. At a hearing held on July 14, 2004, the Debtor consented to the entry of an order for relief under Chapter 11 and the immediate conversion of the case to a Chapter 7 bankruptcy proceeding. On the same day, the Court entered an Order Granting (I) Entry of an Order for Relief Under Chapter 11 of the Bankruptcy Code and (ii) Converting the Case to a Chapter 7 Liquidation Proceeding Pursuant to 11 U.S.C. § 1112(b). The Office of the United States Trustee for Region Three then appointed Charles M. Forman, Esq. to serve as Trustee for the Debtor's Chapter 7 Estate on July 14, 2004.

On September 27, 2004, Wanland & Associates, Inc. ("Plaintiff" or "Wanland") filed a

---

[1]The petition was filed by (I) Popular Leasing USA, Inc; (ii) OFC Capital, a Division of ALFA Financial Corporation; and (iii) Partners Equity Capital Company, LLC. See Docket No. 1, Involuntary Petition for Relief.

putative class action suit in the New Jersey Superior Court, Ocean County against Nortel Networks Corporation ("NNC") and several executives and/or employees of NorVergence including Thomas N. Salzano, Alexander L. Wolf and Robert J. Fine ("Fine"). Notably, NorVergence was never named as a party to this suit.

On February 28, 2005, NNC removed the putative class action suit to the United States District Court for the District of New Jersey pursuant to 28 U.S.C. §§ 1332, 1334, 1441 and 1451. Shortly thereafter, on or about March 7, 2005, NNC moved to dismiss the Plaintiff's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

On March 24, 2005, Wanland amended its class action complaint by substituting Nortel Networks Limited and Nortel Networks, Inc. (collectively, "Nortel" or the "Nortel Defendants") for NNC and adding Qwest Communications International, Inc. ("Qwest") as a defendant. On or about March 28, 2005, the Honorable Mary L. Cooper, United States District Judge for the District of New Jersey issued an Order to Show Cause as to why the Wanland class action suit should not be remanded to the New Jersey Superior Court for lack of subject matter jurisdiction.

On or about April 22, 2005, the Nortel Defendants moved to dismiss the amended complaint. Qwest similarly moved to dismiss the amended complaint pursuant to Fed. R. Civ. Pro. 12(b)(6) on June 9, 2005.

By Order and Judgment dated June 20, 2005, Judge Cooper determined that the Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) as the class action was "related to" the NorVergence bankruptcy proceeding. The District Court subsequently vacated its Order to Show Cause and referred the action to this Court pursuant to 28 U.S.C. § 157. The District Court further denied the pending motions to dismiss "without prejudice to either (I) address the issue presented

therein in the Bankruptcy Court, or (ii) move to reinstate if the action is returned to this Court."

On September 8, 2005, Qwest moved to withdraw the reference. Shortly thereafter, the Nortel Defendants and Fine joined in Qwest's motion to withdraw the reference. On or about March 17, 2006, the District Court denied the motion and referred the Wanland class action suit to this court.

**Allegations in the Amended Complaint**

The amended complaint alleges that the Debtor through its former executives, Thomas N. Salzano, Alexander L. Wolf, and Robert J. Fine and in conjunction with its "business partners", Nortel and Qwest "defrauded thousands of small and medium sized businesses of millions of dollars by inducing them to purchase telecommunication service packages which required them to sign documents purporting to be 'equipment leases.' Those 'equipment leases' required the 'lessees,' including Plaintiff, to pay thousands of dollars to lease equipment which was . . . worth very little." Amended Class Action Complaint, ¶ 2 (March 24, 2005). As sophisticated telecommunications providers, the complaint maintains that Nortel and Qwest knew or should have known of the Debtor's scheme and that Nortel and Qwest "profited from the scheme by supplying products and services to NorVergence, and by permitting NorVergence to use their well-known names and trademarked logos to induce target businesses to become NorVergence customers." Id. ¶ 3.

By way of background, in 2001, several Nortel executives including Alexander Wolf, NorVergence's Chief Operating Officer, left Nortel to form the Debtor. Id. ¶ 15. After NorVergence was launched, Nortel apparently formed "a co-marketing partnership with NorVergence." Id. ¶ 16. It is alleged that Nortel engineers "collaborated with NorVergence in the development and marketing of MATRIX technology" and that both parties entered a Purchase and

6

Licence Agreement ("PLA") in furtherance of this partnership. Id. ¶¶ 16,17. Pursuant to the PLA, "Nortel supplied products and services to NorVergence and Nortel enrolled NorVergence in its Services Partner Initiative Co-Marketing Program for the purpose of 'promoting joint sales of Nortel Networks / [NorVergence] solutions by NorVergence.'" Id. ¶ 18. By the terms of the PLA, Nortel Networks Limited granted the Debtor "the right to use its 'Solutions by Nortel Networks' trademark along with the logo referred to as the 'globemark,' in the United States. Id. ¶ 20. Although this partnership ended on December 31, 2003, it is further alleged that Nortel continued to conduct business with the Debtor. Id. ¶ 21.

The amended complaint similarly alleges that Qwest itself, and through its subsidiaries, formed a partnership with the Debtor. Id. ¶ 22. Qwest agreed to "provide wholesale telecommunication services to NorVeregnce [and] included NorVergence it its Business Partner Program." Id. As a member of the Business Partner Program, the Debtor was authorized to use the Qwest logo in connection with the NorVergence logo on promotional material. Id. ¶ 23.

The amended complaint alleges that the Debtor prominently displayed the Nortel and Qwest logos along aside with its own logo. Id. ¶ 25. It is further maintained that "NorVergence assured potential customers that they could trust NorVergence by invoking the well-known name of its business partners, Nortel and Qwest." Id. ¶ 27. Even the forms utilized in connection with the ERA (Equipment Rental Agreement) featured the Nortel and Qwest logos. Id. ¶ 29. The Plaintiff alleges that "Nortel and Qwest knew or should have known that the Matrix boxes could not perform the functions attributed to them in the brochures, scripts and sales calls which prominently featured their corporate names and trademarked logos." Id. ¶ 32. The Plaintiff alleges that Nortel and Qwest "failed to disclose to prospective customers that the value of the Matrix box was minimal" and that

7

the parties intended to "assign the Matrix box 'lease' to a third party leasing company shortly after the lease was executed."  Id. ¶¶ 37, 38.  It is further alleged that the Debtor, Nortel and Qwest structured the ERAs to look like equipment leases under Article 2A of the Uniform Commercial Code.   It is further alleged that-

> Nortel, Qwest and NorVergence targeted business too small to have a telecommunication expert for telecommunication contracts masquerading as equipment leases.  They virtually never explained the terms of those contracts to their customers, knowing that even if the customer read every work of the fine print it was unlikely that the customer would understand or appreciate the rights and remedies that the contract attempted to take away from them.

> As a result, thousands of small and medium sized businesses have lost thousands of dollars apiece in 'lease' payments for virtually worthless equipment, and those businesses are entitled to treble damages under the New Jersey Consumer Fraud Act. Id. ¶¶ 45, 46.

The complaint was brought pursuant to Federal Rule of Civil Procedure 23 on behalf of "all persons, including businesses, which signed documents purporting to be 'equipment leases' for one or more Matrix boxes, Matrix SoHO boxes, or other network equipment units provided by NorVergence, Inc. (the "Class")." Id.  ¶ 47.  The Plaintiff contends that the Class satisfies the numerosity requirement because approximately ten thousand businesses signed the equipment leases for the Matrix boxes. Id. ¶ 49.  Next, the Plaintiff asserts that members of the Class are located through the United States thus, joinder of each Class member is impracticable.  Id.   The Plaintiff maintains that the case involves issues of law or fact which are common to the Class and such common questions predominate over any issues affecting individual class members.  Id. ¶¶ 51, 52.  Finally, the Plaintiff argues that "class action treatment is the most appropriate method for fair and efficient adjudication of this controversy." Id. ¶ 58.

Count I of the amended complaint alleges violations of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 et seq. as well as violations of other state consumer fraud protection statutes. Specifically, Count I states that "[a]ll Defendants were under a duty to disclose all known material facts in connection with the Matrix box transactions, and to refrain from engaging in any unconscionable commercial practice, deception, fraud, false pretense, false promise or misrepresentation." Id. ¶ 63. Purportedly, the Nortel defendants, as the owner of the "Solutions by Nortel Networks" trademark and globalmark, "were also under a duty to ensure that their licensees did not use their mark in such manner as to deceive the public, and are liable for any fraudulent use of their mark by its licensees, including licensee NorVergence." Id. ¶ 64. "By misrepresenting, inter alia, the value of the Matrix box, and concealing known facts regarding the actual value of the Matrix boxes, and the Nortel / NorVergence business plan, Defendants engaged in unconscionable practices as prohibited by the [New Jersey Consumer Fraud Act]." Id. ¶ 66.

Count II of the amended complaint, alleging negligent misrepresentation, alleges that "[a]ll Defendants were under a duty to be truthful in their business dealings, and that Nortel Defendants were under a duty to ensure that their licensees do not use their mark in such manner as to deceive the public. . ." Id. ¶ 70. The Plaintiff provides that the Defendants "made false statements of material fact to Plaintiff and the Class, including false statements regarding the value of the Matrix box, and omitted material information from Plaintiff regarding the Nortel/NorVergence business plan." Id. The Defendants intended Plaintiff to rely on these false statements and the Plaintiff so relied. Id. ¶ 72.

Count III of the amended complaint, sounding in restitution, disgorgement and constructive trust for unjust enrichment of defendants, alleges that "Defendants have benefitted unjustly from

the profits earned by the 'leasing' of Matrix boxes." Id. ¶ 75. Specifically, the Defendants benefitted

from the class member's overpayment for the Matrix boxes and for telecommunications services

which were not provided. Id. ¶¶ 77, 78.

The Plaintiff, individually and on behalf of all others similarly situated, requests judgment

and relief against the Defendants as follows:

1.   For compensatory damages in an amount to be proven at trial, multiplied where permitted
     by law;
2.   For punitive damages in an amount to be determined at trial, where permitted by law;
3.   For disgorgement and restitution in an amount to be proven at trial;
4.   For interest at the legal rate of interest on the foregoing sum;
5.   For attorneys' fees herein incurred;
6.   For costs of suit herein incurred; and
7.   For such other and further relief as the Court may deem proper.

Id., p. 18.

<u>REQUEST FOR RELIEF</u>

**A.    Nortel's Motion to Dismiss**

On April 13, 2006, the Nortel Defendants filed the instant motion to dismiss the Amended

Complaint on the grounds that the allegations fail to establish any connection between the Plaintiff

and Nortel. With respect to the Nortel Defendants, the amended complaint first alleges that they

maintained a business relationship with the Debtor which terminated on December 31, 2003. Id. ¶

21. Next, the amended complaint alleges the Debtor utilized the Nortel trademarked Logos in

conjunction with its promotional materials. Id. ¶ 8. The amended complaint further maintains that

the Debtor and Nortel entered into the PLA whereby Nortel agreed to provide products and services

to the Debtor and authorized the Debtor to use the trademark of Nortel Networks Limited. Id. ¶ 20.

However, Nortel argues that the complaint does not allege "that Nortel had any contract or

other commercial arrangement with Plaintiff; had any relationship or dealings with Plaintiff; made

any misrepresentations to Plaintiff; had any connection with Plaintiff; or engaged in any wrongdoing directed at Plaintiff." Memorandum in Support of the Motion of Nortel Networks Limited and Nortel Networks Inc. to Dismiss the Amended Complaint ("Nortel Br."), p.1 (April 13, 2006). The Nortel Defendants contend that maintaining a business relationship in addition to a trademark agreement with the Debtor is neither tortious nor actionable. Id. p. 2. Nortel further alleges that the Amended Complaint fails to plead the fraud-based claims with particularity. Id. at p. 18. The Nortel Defendants emphasize that the Amended Complaint does not allege that they made any "statements, or misstatements to Plaintiff or to anyone else"," that Nortel solicited business from Plaintiff", "that Nortel was a party to any alleged equipment leases", "that Nortel manufactured or sold 'Matrix boxes'", or "that Nortel acted in any way toward Plaintiff." Id. ¶ 11.

With regard to the Plaintiff's allegation that a provision of the PLA required the Nortel Defendants to endorse NorVergence at "Road Shows," the Nortel Defendants argue that the amended complaint does not demonstrate that the Plaintiff attended such "Road Shows" or were otherwise contacted by the Nortel Defendants. Id. ¶ 12.

Nortel has argued in its papers and during oral argument that the claims against it should be dismissed because Nortel did not have any duty with respect to plaintiff and without such duty, Nortel asserts there is no basis for the claims alleged against it in the Complaint. A related contention raised by Nortel is that Nortel lacked any relationship with Plaintiff which would give rise to the claims in the Complaint.

As to Count One of the Amended Complaint, the Nortel Defendants first argue that "[a]bsent a legally recognized duty, there is no tort, there is no violation of New Jersey's Consumer Fraud Act and there is no equitable claim." Id. at p. 6. The Nortel Defendants assert that the Debtor's use

11

of the Nortel trademark under the PLA is an insufficient nexus upon which to establish that Nortel owed a duty to the Plaintiff.

To establish liability under the New Jersey Consumer Fraud Act ("NJCFA"), the Nortel Defendants contend that the moving party must establish that "defendant undertook affirmative acts or omissions; and that the affirmative act or omission was the proximate cause of an ascertainable loss." See Chattin v. Cape May Greene, Inc., 243 N.J.Super. 590, 606, 581 A.2d 91 (App. Div. 1990), aff'd 124 N.J. 520, 591 A.2d 943 (1991). The Nortel Defendants contend that the complaint fails to establish the necessary connection between the parties, any material misrepresentation or omissions by Nortel or causation to sustain a cause of action under the NJCFA.

First, Nortel asserts that while the amended complaint alleges significant contact between Plaintiff and NorVergence which includes "a broad scheme by which NorVergence pursued customers with business proposals", "entered into equipment lease agreements with customers", "dictated terms of those agreements", "and subsequently assigned or transferred its rights and obligations under those agreements to others" the complaint does not outline any allegations relating to Nortel. Id. at 9. The Nortel Defendants rely on a district court decision, Peters v. United States Department of Housing and Urban Development, No. 04:06057 (RBK), 2006 WL 278916 (D.N.J. Feb. 1, 2006) for the proposition that an action under the NJCFA is precluded where no contact exists between the parties and the defendant was incapable of making an affirmative misrepresentation or omission of material fact. Next, the Nortel Defendants contend that the amended complaint fails to allege any affirmative misrepresentation or material omission. As for the allegation that Nortel failed to disclose the apparent minimal value of the Matrix Box, the Nortel Defendants assert that the opinion of a product's value is not a fact which warrants disclosure.

Regarding the allegation that Nortel did not disclose NorVergence's intent to assign the equipment lease, Nortel replies that the complaint does not allege that it had any knowledge as to what NorVergence intended to do in the future. Finally, the Nortel Defendants assert that causation is not properly plead in the amended complaint. Since no causal link is demonstrated between the Plaintiff and Nortel, "no act or omission by Nortel could have caused Plaintiff harm." Id. Since the amended complaint fails to plead a cause of action under the NJCFA, the Nortel Defendants seek dismissal of Count One of the Amended Complaint.

The Nortel Defendants similarly argue that Count Two of the amended complaint which alleges negligent misrepresentation should be dismissed as a matter of law. In support thereof, Nortel has cited, among other authorities, the holding in Pennsylvania National Turf Club, Inc. v. Bank of West Jersey, 158 NJ Super. 196, 203, 385 A.2d 932 (App. Div. 1978), cert. denied 77 N.J. 506, 391 A.2d 520 (1978), where the court stated that "[i]n the absence of evidence of any agreement, undertaking or contact between plaintiff and defendant from which any special duty can be derived, the improper handling of the ... account cannot in the abstract serve as a stepping stone for liability to plaintiff."[2] Nortel has also referred this Court's attention to City Check Cashing, Inc. v. Manufacturers Hanover Trust Co., 166 N.J. 49, 59, 764 A.2d 411 (2001) wherein the New Jersey

_____

[2]     In reversing the trial court decision, the appellate court in Pa. Nat'l. Turf found that while compliance with the Uniform Commercial Code as codified in New Jersey "does not necessarily immunize [the defendant bank] from ordinary tort liability", "a fundamental requisite" for such liability "is the existence of a duty owing from defendant to plaintiff." This Court notes that the NJ Appellate Division had the benefit of reviewing a case where the relevant facts had been presented during the non-jury trial before the Superior Court Judge who found in favor of plaintiff.  The appellate court pointed out that " [t]he factual background" in the matter was "both interesting and essential for an understanding of the determination of the legal issues involved." 158 N.J. Super. 196, 199, 385 A.2d 932 (App. Div. 1978), cert. denied 77 N.J. 506, 391 A.2d 520 (1978).  After reviewing those facts and record of the case the court determined that no duty existed and reversed the trial court decision.

Supreme Court stated that "[i]n actions based on nonfeasance, as is the case here, 'it is necessary to find some definite relation between the parties, of such a character that social policy justifies the imposition of a duty to act.'"[3]   Nortel contends that it does not maintain any relationship with the Plaintiff which would give rise to a duty to disclose.  The amended complaint fails to allege that  the Plaintiff maintained either a fiduciary or quasi-fiduciary relationship, a special relationship or even an "intrinsically fiduciary" relationship with Nortel.

Next, the Nortel Defendants assert that the amended complaint fails to identify any act or omission that constitutes a misrepresentation.   Without a duty to disclose and without a misrepresentation, the Nortel Defendants argue that the Plaintiff cannot establish that the damages were proximately caused by Nortel.   Accordingly, Nortel argues that it did not owe a duty to the Plaintiff, no material misrepresentation or omissions are alleged and no causation is demonstrated and therefore, the Nortel Defendants contend that the negligent misrepresentation count should be dismissed as a matter of law.

The Nortel Defendants, citing Callano v. Oakwood Park Homes Corp., 91 N.J. Super 105, 109, 219 A.2d 332 (App. Div. 1966) and In re Rezulin Products Liab. Litig., 390 F. Supp. 2d 319, 343 (S.D.N.Y. 2005), among other authorities, further argue that Count Three of the amended complaint which alleges unjust enrichment should be dismissed as a matter of law since there has

---

[3]       The Court notes that City Check addressed a distinct factual scenario involving check cashing and the Uniform Commercial Code and which involved a question of "whether the drawee bank's dealings with a non-customer in an unsolicited telephone conversation breached a common law duty, rendering it potentially liable for the loss." 166 N.J. 49, 52, 764 A.2d 411 (2001) .  The court determined the following: "in the check collection arena, unless the facts establish a special relationship between the parties created by agreement, undertaking or contact, that gives rise to a duty, the sole remedies available are those provided in the [Uniform Commercial] Code." Id. at 62.

been no relationship established between Plaintiff and Nortel.  See Callano, 91 N.J.Super at 109

( holding that a common thread in finding quasi-contract liability has been "that the plaintiff

expected remuneration from the defendant, or if the true facts were known to plaintiff, he would

have expected remuneration from defendant, at the time the benefit was conferred" and further that

there was "some direct relationship between the parties or a mistake on the part of the person

conferring the benefit."); Rezulin, 390 F. Supp. 2d at 343 (holding that "Under New Jersey law,

absent a mistake by the person conferring the benefit, unjust enrichment claims require 'some direct

relationship between the parties'").    Since the Plaintiff has not established a relationship with

Nortel, Nortel maintains that the complaint fails to establish that Nortel unjustly received anything

from the Plaintiff.

Finally, the Nortel Defendants assert that dismissal of the complaint is warranted on the

grounds that it fails to plead fraud-based claims with particularity.  Fed. R. Civ. P.  9(b) requires that

"[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be

stated with particularity.  Malice, intent, knowledge and other condition of mind of a person may

be averred generally." Fed. R. Civ. P. 9 (b).  It is Nortel's position that the complaint is devoid of

any particularity and "fails to allege what acts were fraudulent, what statements were untrue, or what

omissions were material."  Nortel argues that the complaint does not identify who committed fraud

or even when the fraud occurred.   While the complaint set forth specific allegations about

NorVergence, it is Nortel's position that the fraud-based claims as plead are insufficient to put

Nortel on notice as to the specific nature of the causes of action against it.

**Plaintiff's Response to Nortel's Motion to Dismiss**

15

The Plaintiff filed a Response Opposing the Motion of Nortel Networks Limited and Nortel Networks Inc. to Dismiss the Amended Complaint ("Pl. Resp. to Nortel"). The Plaintiff first argues that the NJCFA itself gives rise to a duty to refrain from unconscionable commercial conduct and to disclose material facts. The Plaintiff further distinguishes the district court decision, Peters v. United States Department of Housing & Urban Development, No. 04:06057 (RBK), 2006 WL 278916 (D.N.J. Feb. 1, 2006), upon which the Nortel Defendants rely. Unlike Peters, the Plaintiff asserts that, here, Nortel "was a knowing partner in the fraudulent scheme with NorVergence." The Plaintiff further maintains that the case Judge v. Blackfin Yacht Corp., 357 N.J. Super. 418, 815 A.2d 537 (App. Div. 2003), cert. denied, 176 N.J. 428, 824 A.2d 157 (2003) reinforces its position that the NJCFA required the disclosure of material information in connection with the sale or advertising of merchandise. By operation of the NJCFA, the Plaintiff argues that Nortel owed it a duty, independent of the traditional analysis of duty in negligence actions. Next, the Plaintiff contends that NorVergence's use of Nortel's globemark logo gave rise to a duty to the Plaintiff. By licensing its trademark to NorVergence, it is alleged that Nortel knowingly permitted the Debtor to misuse the trademark and induce consumers to purchase NorVergence products.

The Plaintiff further contends that the complaint properly pled the remaining elements to sustain a cause of action under the NJCFA as well as negligent misrepresentation. In particular, Nortel failed to-

> disclose material information, such as the fact that the Matrix boxes did not do what the brochures with Nortel's logo say they did; the fact that Plaintiff and the class would pay tens or hundreds of dollars for Matrix boxes that were virtually worthless, and the fact that Plaintiffs and the class would be forced to continue payments after service had been cut off, but Nortel's conduct in knowingly permitting the use of its logo in connection with a false and misleading statements is clearly an unconscionable commercial practice.

Pl. Resp. to Nortel at 12.

Contrary to Nortel's assertions that its opinion as to the value of the Matrix boxes is not actionable, the Plaintiff cites several cases for the proposition that the NJCFA is violated when goods and services are sold for prices which far exceed their value. See Kugler v. Romain, 58 N.J. 522, 279 A2d 640 (1971); Perth Amboy Iron Works v. American Home Assurance Co., 226 N.J. Super 200, 543 A.2d 1020 (1988), aff'd, 118 N.J. 249, 571 A.2d 294 (1990); and Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 696 A.2d 546 (1997).  In addition, the Plaintiff asserts that NorVergence's intention to assign the Matrix box leases to third parties was a material fact which should have been disclosed.  Finally, the Plaintiff argues that a causal connection between the parties arose when the Debtor used Nortel's name and logo "in connection with false and misleading promotional materials." The Plaintiff opines that the fact that the Plaintiff and the class members were induced to sign the Matrix box leases on account of the trusted Nortel name establishes a causal connection between the parties.   It should be noted that the Plaintiff alternatively argues, citing Cox  v. Sears Roebuck & Co., 138 N.J. 2, 16, 647 A.2d  454 (1994),  that the class can recover under the NJCFA even in the absence of a casual connection.

Furthermore, the Plaintiff states that the amended complaint satisfies the pleading requirements as set forth in Rule 9(b).  Arguably, the Plaintiff identified the parties involved, described the Debtor's fraudulent scheme, alleged how Nortel participated in such scheme and identified specific information which Nortel should have disclosed.

Finally, the Plaintiff argues that the amended complaint properly pleads a claim for unjust enrichment.  Contrary to Nortel's position, the Plaintiff contends, citing as an example the case of New  York  Career  Guidance  Services,  Inc.  v.  Wells  Fargo  Financial  Leasing,  Inc., No.

BER-L-1705-03,  2005 WL 1252315 at *6 ( N.J.Super. Ct., Law Div. May 2, 2005), that a claim for

unjust enrichment which is related to consumer fraud claims may be sustained even if Plaintiff did

not "expect renumeration" from Nortel.  Plaintiff distinguishes the case of Callano v. Oakwood Park

Homes Corp., 91 N.J. Super. 105, 108, 219 A.2d 332 (App. Div. 1966) relied on by Nortel on the

basis that Callano involved unjust enrichment claims based on quasi-contract theories which the

Plaintiff herein is not alleging.  Pl. Resp. to Nortel at 16.   Plaintiff further distinguishes the case

of  In re Rezulin Products Liab. Litig., 390 F.Supp.2d 319 (S.D.N.Y. 2005) relied upon by Nortel

on the basis that in In re Rezulin, there were two degrees of separation between the plaintiff and

defendant and in Plaintiff's view the Court ruled based on the degree of attenuation and not because

the connection between the parties was indirect. Pl. Resp. to Nortel at 17. Plaintiff adds that in the

matter sub judice, it is alleged that "Nortel and Norvergence were partners in the alleged consumer

fraud" which plaintiff claims " bridges any purported gap between Plaintiff and  Nortel." Id. at 18.

**Nortel's Reply**

The Nortel Defendants reply brief initially focuses on the issue of whether the Debtor's

authorized use of Nortel's trademarked logos gave "rise to a duty on the part of Nortel to protect the

public at large from NorVergence's alleged bad acts".  While the Nortel Defendants recognize a

duty to police one's trademarks to "ensure the integrity of registered trademarks[,]" they argue that

this duty is not so expansive as to impose a "duty to the public at large aris[ing] from one's failure

to police and monitor its trademarks." Reply Brief of Defendants Nortel Networks Limited and

Nortel Networks Inc. in further support of Motion to Dismiss the Amended Complaint ("Nortel

Reply") at 4, citing Oberlin v. Marlin American Corp., 596 F.2d 1322, 1327 (7th Cir. 1979).  In other

words, as Nortel explained during the hearing, citing the Oberlin case, among others, the duty to

police one's trademark does not give rise to tort liability to a third party stranger.  Mot. to Dismiss

Hr'g. Tr. 13-17, Sept. 13, 2006.   It is Nortel's contention that the Plaintiff's brief fails to cite any

case law which would support the Plaintiff's expansive interpretation of trademark liability.

Consequently, the Plaintiff's reliance on the Nortel logo should not save the complaint from

dismissal.

Next, the Nortel Defendants contend that the complaint is premised on a theory of "guilty

by association." While the amended complaint is "replete with extensive reminders of the

wrongs it suffered at the hands of NorVergence" the Nortel Defendants emphasize that

allegations relating to them are vastly different.  Nortel Reply. at 8.  It is alleged that the Nortel

Networks, Inc. entered into a Purchase and License Agreement ("PLA") with the Debtor wherein

Nortel agreed to provide products and services to NorVergence.   Under the PLA, the Debtor was

authorized to use a trademark owned by Nortel Networks Limited.  Finally, it is alleged that

Nortel knew or should have known of NorVergence's fraudulent scheme including the true value

of the Matrix boxes and Debtor's intentions to assign the equipment rental agreements.  Nortel

contends that these allegations however "do not allege that the Nortel name or trademarked logo

were themselves deceptive or misleading . . ." Id.  Having a contract with the Debtor is not

within itself misleading or  unconscionable.  Nortel further states that there are no allegations

that Nortel communicated at all with the Plaintiff.   Consequently, Nortel provides that it should

not be held liable solely for knowing and entering a contract with an alleged wrongdoer.

Addressing the issue of particularity, Nortel reaffirms its position that the complaint fails to

plead the fraud-based claims with the required  level of particularity dictated in Fed. R.Civ. P. 9(b).

19

Accordingly, the amended complaint neither establishes a relationship with the Plaintiff which would impose a duty to speak on Nortel nor identifies tortious conduct on behalf of Nortel.

Finally, Nortel contends that the complaint fails to establish all of the necessary elements of unjust enrichment. To sustain a cause of action for unjust enrichment, plaintiff must have "expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that failure of remuneration enriched defendant beyond its contractual rights." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994). Notably, Nortel has never argued that the Plaintiff does not maintain a viable cause of action for unjust enrichment against NorVergence or against the leasing companies who hold assigned leases. Notwithstanding, Nortel clarifies that it is an entity distinct from NorVergence and that the amended complaint does not allege that the Plaintiff conferred any benefit to Nortel.

**B.    Qwest Communications International, Inc.'s  Motion to Dismiss**

On or about April 14, 2006, Qwest Communication International, Inc. filed a motion to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) as applicable by Federal Rules of Bankruptcy Procedure 7012(b) and 7009. In the preliminary statement, Qwest contends that the amended complaint violates Rule 9(b) by "lumping together the alleged misdeeds of Qwest, Nortel and NorVergence, instead of pleading with particularity what misrepresentations each defendant allegedly made." Brief in Support of Qwest Communications International Inc.'s Motion to Dismiss Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) ("Qwest Br."), p. 1 (April 14, 2006). Quest argues that the amended complaint should be dismissed for its failure to establish any relationship or duty owed to the Plaintiff, its failure to set forth any

misrepresentation or even establish that Qwest had knowledge of NorVergence's alleged fraudulent scheme.

Qwest maintains that the specific allegations in the Amended Complaint pertaining to it are "thinner" than the allegations pertaining to Nortel. Id. at 5. In particular, the complaint alleges that in 2001 Wolf and other Nortel personnel left the company to form a new entity, NorVergence. Id. Shortly thereafter, Nortel and NorVergence formed a co-marketing partnership to develop and market the Matrix box. Id. In furtherance of this partnership, it is alleged that Nortel entered the PLA with the Debtor whereby the parties agreed to joint sales program directed at small and medium sized businesses. Id. at 4-5. Unlike the Nortel Defendants, Qwest asserts that it was not involved in this "co-marketing partnership" nor was it involved in the development of the Matrix boxes. Id. at 5. Rather, the amended complaint merely alleges that on an unspecified date, Qwest "'formed a partnership with NorVergence,' that Qwest agreed to provide wholesale telecommunications services to NorVergence and that Qwest included NorVergence in its Business Partnership Program. In connection with the Business Partnership Program, Qwest allegedly permitted NorVergence to use the Qwest logo on NorVergence brochures and business forms." Id.; Complaint ¶¶ 22-23. The amended complaint however, does not allege that Qwest or Nortel made any statements directly to Wanland, that Qwest and or Nortel were parties to the equipment leases or that Qwest or Nortel received payment from the equipment leases. Nor is a copy of the lease attached to the Amended Complaint Qwest Br. at 7.

Qwest does not deny that it maintained a relationship with NorVergence, but rather describes that relationship as limited. Id. at 8. Quest relates that in 2001, NorVergence and Qwest Communications Corp. ("QCC") entered a Wholesale Services Agreement ("WSA") wherein

NorVergence agreed to purchase telecommunications services from QCC over a three year period.
Id. at 8-9; Declaration of John Carlson ("Carlson Decl."), Ex. B. Under the terms of the WSA,
Qwest asserts that "[r]esale of the services to retail customers of NorVergence was at NorVergence's
financial risk without liability to QCC; NorVergence's duty to pay QCC was not contingent on
collection from its retail customers." Qwest Br. at 9; Carlson Decl. Ex. B., ¶ 13.2. Paragraph 10
of the WSA expressly describes the relationship as follows: "Relationship. Neither Party shall have
the authority to bind the other by contract or otherwise make any representations or guarantee on
behalf of the other. The relationship arising from this Agreement does not constitute an agency,
joint venture, partnership, employee relationship or franchise." Carlson Decl. Ex. B. ¶ 10.
Paragraph 5 of the WSA further outlined the use of Qwest's name and trademark. Paragraph 5 states
is relevant part-

Use of Names and Marks.

Neither party shall use any trademark, service mark, brand name, copyright, patent,
use of names and marks or any other intellectual property of the other Party or its
respective Affiliates without the other Party's prior written consent and in the case
of Qwest with the prior written consent of the Senior Vice President of Corporate
Communications. Notwithstanding the foregoing, Customer may disclose to its end
users that Qwest is the underlying facilities provider of the Services, but only if: (1)
the full details of the required disclosure are timely presented to Qwest in advance;
and (2) Qwest, in its sole and exclusive discretion, issues a written approval of the
requested disclosure. Qwest's name is proprietary and nothing herein constitutes a
license authorizing its use, and in no event shall Customer attempt to sell service to
its End Users using Qwest's name. In addition, Customer shall not state to End
Users or prospective End Users: (I) that they will be Qwest Customers or that they
may obtain Qwest service from Customers; or (ii) that Customer has any relationship
with Qwest other than an agreement to purchase Qwest's Services on a wholesale
basis. Since a breach of this material obligation may cause irreparable harm for
which monetary damages may be inadequate in addition to other available remedies,
the nonbreaching Party may seek injunctive relief or any disclosure in violation
hereof.

Carlson Decl. Ex. B. ¶ 5.

In August of 2003, NorVergence and QCC executed a second WSA (the "2003 WSA"). Carlson Decl., Ex. C. Qwest maintains that the 2003 WSA was very similar to its predecessor. Accordingly, the "2003 WSA continued the 2001 WSA's restrictions on NorVergence's use of QCC marks, but it now restricts specifically use 'including but not limited to the Qwest and Qwest Business Partner Logos.'" Qwest Br. at 10; Carlson Decl., Ex. C. ¶ 5. Qwest notes that the 2003 WSA specifically prohibited NorVergence from attempting to "sell services to its End Users using the name of Qwest or its Affiliates or Qwest IP materials, including but not limited to the Qwest and Qwest Business Partner Program Logos." Qwest Br. at 10.; Carlson Decl., Ex. C, ¶ 5.

In addition to the WSA, Qwest acknowledges that in February 2002, Qwest Services Corporation ("QSC") entered into a Master Representative Agreement ("MRA") with the Debtor. See Carlson Decl. Ex. D. Under the MRA, NorVergence was permitted to "solicit orders from prospective commercial (non residential) subscribers to telecommunications and multimedia services specified and provided by Qwest." Carlson Decl. Ex. D at ¶ 1. Qwest further agreed to pay NorVergence a commission for orders which arose directly from their solicitation efforts. Id. at ¶ 2. Under paragraph ¶ 5(c) of the MRA, a Representative [of NorVergence] "shall identify itself as a Representative for the *Qwest Business Partner Program* solely in connection with the marketing to prospective Subscribers and shall otherwise identify itself as an independent business." Id. ¶ 5(c). Moreover, Representatives were only permitted to use "Qwest–approved marketing materials" and prohibited from using its own literature or modifying the approved materials. Id. ¶ 5(d).

Qwest maintains that the provisions set forth in MRA only allowed NorVergence to solicit orders for the retail sale by Qwest of Qwest services while it expressly prohibited the use of NorVergence's own promotional materials in connection with such solicitation. Qwest Br, at 11.

Qwest further asserts that the MRA prohibited the use of the Qwest trademark by NorVergence to "imply that other goods or services marketed by NorVergence, including the Matrix box, are Qwest products or have been approved by Qwest." Id. at 11.  Echoing the provision of the WSA, Qwest points out that the MRA did not create a joint venture, partnership, agency or employment relationship with the Debtor.  The MRA was effectively terminated as of July 19, 2002, approximately five months after the agreement was executed.  Id. at 12. Carlson Decl., Ex. E.

Since the Amended Complaint fails to allege a specific date as to when Wanland became a customer of NorVergence, Qwest asserts that the complaint fails to establish that the Debtor was within Qwest's Business Partner Program at that time.  The complaint does not allege that Wanland was a retail purchasers of Qwest services under the MRA or that NorVergence solicited Wanland's business for Qwest under the Business Partnership Program. Qwest Br. at 12.

Before addressing the specific counts, Qwest has moved to dismiss the amended complaint for its failure to plead fraud with particularity under Fed. R. Civ. P.  9(b).  It is Qwest's position that Wanland has not plead the particular facts as to Qwest's alleged misconduct but rather has blended "its claims against Qwest into an undifferentiated mass." Id. at 14.  To satisfy the pleading requirements of Rule 9(b), a fraud claim must allege "all of the essential factual background that would accompany the first paragraph of any news story- the 'who, what, when, where and how' of the events at issue." In re Rockefeller Ctr. Props., Inc. Sec. Litig., 311 F.3d 198, 217 (3d Cir. 2002). Qwest argues that the complaint fails to allege specific misrepresentations made by Qwest to Wanland, specific facts that Qwest concealed to Wanland, specific individuals to which misrepresentations were made and how the misrepresentations occurred.  Qwest contends that the Amended Complaint does not allege that Qwest was a party to the Wanland equipment lease, or that

24

Qwest knew of the terms of the lease or that Qwest received any proceeds from the Wanland equipment lease. In particular, Qwest argues that the complaint does not allege that Qwest designed or marketed the Matrix box, that NorVergence was an agent of Qwest, that NorVergence's use of the Qwest name or logo was authorized, or even that the use of the Qwest name and trademark induced Wanland to enter the equipment lease. Since the complaint fails to demonstrate how Qwest participated in the Debtor's fraudulent scheme or how it violated the NJCFA, Qwest requests that this Court dismiss the complaint for its failure to plead fraud with particularity under Rule 9(b).

As for Count I, Qwest asserts that the complaint fails to state a claim that Qwest violated the NJCFA. To sustain a claim under the NJCFA, Qwest provides that the moving party must establish (I) an affirmative misrepresentation, with or without intent to deceive, that has the capacity to mislead the average consumer, (ii) a knowing omission of a material fact, made with the intent to deceive or (iii) violation of a regulation promulgated under the Act. Cox v. Sears Roebuck & Co., 138 N.J. 2, 17-19, 647 A.2d 454 (1994). Qwest asserts that the complaint neither pleads an affirmative misrepresentation by Qwest nor a knowing omission by Qwest or causation.

Although some of NorVergence's promotional materials utilized in connection with the marketing of the Matrix box contained the Qwest logo, Qwest states that the amended complaint does not allege that Qwest authorized the use of its logo in connection with the marketing of the Matrix box. Id. at 19. Moreover, Qwest argues that the complaint fails to even allege that the telecommunication services which NorVergence marketed with the Matrix box and sold to Wanland even included Qwest's telecommunication services. Id. As a "remote supplier" who did not directly deal with Wanland, Qwest argues that it should only be liable for its own false statements which it communicated to Wanland or for statements Qwest intended others to communicate to Wanland.

25

See Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 226 N.J. Super. 200, 211, 543 A.2d 1020 (App. Div. 1988), *aff'd*, 118 N.J. 249, 571 A.2d 294 (1990).   Qwest contends that the unauthorized use of a remote supplier's trademark is not an indirect promise by the remote supplier. Id. at 20.   In light of the fact that both the MRA and the WSA expressly prohibited NorVergence from using Quest's trademark to market NorVergence's services, Qwest maintains that Wanland can not establish that the use of the Qwest logo was approved by Quest.

Next, Qwest asserts that the complaint fails to allege that it knowingly failed to disclose a material fact with an intent to deceive the party by failing to disclose. See Cox, 138 N.J. at 17. Qwest identifies and addresses the three allegations in the Amended Complaint regarding the failure to disclose.   Qwest Br., at  21.  First, it is alleged that Qwest, and Nortel, knew or should have known that the Matrix boxes could not perform the functions set forth in the promotional materials which bore the Qwest logo. Id.; Complaint ¶ 32.  Second, it is alleged that Qwest, and Nortel, knew or should have known that the true value of the Matrix box did not approach the sums of money contemplated in the "equipment leases" that bore their trademarked logo. Qwest Br., at 21; Complaint ¶ 35.  Third, it is alleged that Qwest, in conjunction with NorVergence and Nortel, failed to disclose to prospective customers NorVergence's intention to immediately assign the equipment leases to third party financing companies.  Qwest Br., at 21; Complaint ¶ 38.  Notwithstanding, Qwest submits that the Amended Complaint does not allege that Qwest knew anything about the Matrix box, that Qwest knew the true capacity of the Matrix box as compared to the promotional materials, that Qwest ever saw or approved the marketing materials, that Qwest knew the price structure of the device or that Qwest knew of NorVergence's intention to assign the equipment rental arrangement to third parties. Qwest Br., at 21-22.  As for the third prong of the NJCFA, Qwest

maintains that the complaint fails to plead a causal relationship between Qwest's acts or omissions and Wanland's alleged loss.  Id. at 23.  In particular, the complaint does not even allege that Wanland relied on a Qwest-authorized use of the Qwest trademark in deciding to do business with NorVergence or lease the Matrix box from NorVergence.  Id.

Moreover, Qwest asserts it is not vicariously liable for NorVergence's fraudulent statements or nondisclosures  since the contractual agreements between the parties clearly state that NorVergence was not Qwest's agent. Qwest claims that  NorVergence lacked actual authority to bind Qwest and NorVergence's unauthorized use of the Qwest logo cannot be construed so as to convey apparent authority to bind Qwest.  Id. at 24-27.  It is argued that NorVergence did not obtain the consent of Qwest for the use of its logo in connection with the marketing of the Matrix box.  As a consequence, NorVergence lacked express authority to speak for Qwest in connection with the Matrix box.

In the alternative, Qwest states that NorVergence lacked implied authority to speak on its behalf as the complaint fails to allege that Qwest knew or even acquiesced to NorVergence's use of their name and logos in connection with the Matrix box.  Qwest further states that NorVergence lacked the apparent authority to bind it since apparent authority can only arise through the actions of  the putative principal. Qwest cites  Busciglio v. DellaFave, 366 N.J. Super. 135, 140, 840 A.2d 897 (App. Div. 2004), *remanded* 2005 WL 1606060, *aff'd*, 2006 WL 3053405, in which the court held that "[a]pparent authority must be established clearly and convincingly by the actions of the principals, not of the alleged agent."

Qwest contends that the face of the Amended Complaint and the agreements between Qwest's affiliates and NorVergence demonstrate that Qwest did nothing whereby Wanland would

reasonably believe that NorVergence was selling Matrix boxes as an agent of Qwest. In addition, it is argued that NorVergence's limited authorized use of Qwest's mark as outlined in the WSA and the MRA to take orders for the direct retail sale of Qwest's telecommunication services by Qwest under the MRA and to identify itself as Qwest's wholesale customer under the WSA does not confer apparent authority for NorVergence's use beyond the scope of the agreements if NorVergence misused Qwest's marks for a forbidden purpose. Since the complaint does not satisfy any of the prongs required to sustain a claim under the NJCFA, Qwest requests that this Court dismiss Count I.

Qwest similarly requests that Count II of the complaint be dismissed for its failure to state a claim for negligent misrepresentation under New Jersey law. Qwest states that dismissal of Count II is proper as the complaint does not set forth any statement or communication or direct relationship of any kind between Qwest and Wanland. Qwest argues that a claim for negligent failure to disclose can only arise where there is a duty to disclose. Qwest Br. at 28 (citing Karu v. Feldman, 119 N.J. 135, 148, 574 A.2d 420 (1990)). As well, Qwest asserts that the complaint does not allege that Qwest benefitted from the equipment lease or any facts from which Qwest might reasonably foresee that Wanland would rely upon information from Qwest in deciding whether to purchase a Matrix box.

Finally, Qwest argues that the complaint does not state a claim for unjust enrichment under New Jersey law. It is not alleged that Qwest received any proceeds pursuant to the equipment leases. Without demonstrating that Wanland conferred a direct benefit on Qwest, Qwest argues that it has not been unjustly enriched. See Prima v. Darden Rest., Inc. 78 F. Supp. 2d 337, 355 (D.N.J. 2000).

28

**Plaintiff's Response to Qwest's Motion to Dismiss**

As a preliminary matter, Wanland argues that this Court should not take into consideration the exhibits attached to the Declaration of John Carlson submitted in support of Qwest's Motion to Dismiss the Amended Complaint. Plaintiff's Response Opposing Motion of Qwest Communications International, Inc. to Dismiss the Amended Complaint ("Pl. Resp. to Qwest") at 4-5 (April 27, 2006). The complaint specifically references the contract between NorVergence and Nortel but does not, however, specifically reference the documents which define the relationship between NorVergence and Qwest. Id. Since the Plaintiff had neither actual notice of these documents nor relied on them in drafting the complaint, the Plaintiff requests that the documents not be considered. Id. at 5 (citing In re NUI Securities Litigation, 314 F.Supp.2d 388, 396 (D.N.J. 2004)). Even if this Court considers the documents, Wanland asserts that dismissal of the complaint is still not warranted as Plaintiff should be afforded the opportunity to conduct discovery in this case.

Wanland first contends that dismissal of the complaint is not proper as the complaint satisfies the pleading requirements of Federal Rule of Civil Procedure 9(b). Wanland's responsive papers cite NN&R, Inc. v. One Beacon Ins. Group, 362 F. Supp. 2d 514, 518 (D.N.J. 2005) for the proposition that "Rule 9(b) does not require that a plaintiff claiming fraud plead the date, place or time of the fraud so long as she uses 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Contrary to Qwest's assertions, Wanland argues that it is not required to plead the who, what, when, where and how so long as the allegations sufficiently put the defendant on notice of the claim. Since the complaint identifies the parties, describes the fraudulent scheme, alleges Qwest's involvement in such scheme and identifies material information which Qwest should have disclosed, Wanland argues that Qwest was put on notice as to the nature

of the claims against it.  Pl. Resp. to Qwest at 7 (citing Talalai v. Cooper Tire & Rubber Co., 360

N.J. Super. 547, 823 A.2d 888 (Law Div. 2001)).

Next, Wanland contends that the contracts provided by Qwest as evidence of the scope of

Qwest's and Qwest's affiliates' relationship with NorVergence establish how Qwest profited from

NorVergence's sales to end users.  Id. at 8.  As Plaintiff explains:

> Qwest agreed to sell telecommunication services, including telephone call 'minutes'
> to NorVergence at wholesale rates.  The Qwest WSAs specifically contemplated that
> NorVergence would sell those 'minutes' to third-party end users.  Qwest then billed
> NorVergence, charging NorVergence by the volume of minutes actually used by
> third parties.  Thus, despite its claims to contrary, the WSAs establish that Qwest did,
> in fact profit from NorVergence's sale of 'equipment leases' and service contracts
> using Qwest's name and logo:  the more minutes that Plaintiff and similarly situated
> small businesses used, the more minutes NorVergence would have to buy from
> Qwest.

 Pl. Resp. to Qwest at 8.

While the documents provided by Qwest may suggest that Qwest did not formally approve

NorVergence's use of its name and logo, Wanland reiterates that "Qwest's name and logo did appear

on false and misleading sales materials and were invoked during sales presentations, and Qwest did

not prevent that from happening." Id.   Wanland further states that the MRA and WSA tend to

suggest that Qwest was aware of NorVergence's improper use of its name and logo.  Id.  This is

evidenced by the fact that the 2003 WSA included an additional restriction which specifically

prohibited NorVergence's use of "Qwest and Qwest Business Partner Logos." Id.  Moreover, it is

Wanland's position that the MRA is merely a red herring as the complaint does not allege that the

Plaintiff or class members purchased telecommunication services directly from Qwest on a per-

minute basis.  Id. at 9.  Wanland explains that its indirect relationship with Qwest arises under the

WSA rather than the MRA.  Id. at 9-10.

Next, Wanland argues that the complaint identifies Qwest's knowing omissions, outlines Qwest's unfair business practices and sets forth damages which resulted from these omissions and business practices. Id. at 10. Wanland posits that affirmative misstatements are not the sole manner "in which a remote supplier can violate the NJCFA." Id. at 11. Wanland further states that "Plaintiff does not purport to plead affirmative misrepresentations by Qwest to Plaintiff or the putative class." Id. Rather, Wanland elects to proceed under the knowing omissions and unconscionable commercial practices in violation of the NJCFA. Id. Thus, Wanland reasons, Qwest's discussion of affirmative misrepresentation is irrelevant. Id. Moreover, Wanland asserts that Qwest's interpretation that the NJCFA may only be violated in three ways, affirmative misrepresentation, knowing omissions and violation of regulations, is incorrect. Id. at 11. Wanland contends rather that Qwest has violated the NJCFA by "knowingly omitting and failing to disclose material facts and by engaging in unconscionable commercial practices." Id. Plaintiff asserts that Qwest's conduct in knowingly permitting NorVergence to use its logo with false and misleading statements is an unconscionable business practice. Id. at 12.

Plaintiff states that the complaint contains sufficient allegations of Qwest's "knowledge" to give rise to a violation of the NJCFA. Id. In the Complaint, Plaintiff alleges that NorVergence utilized the Qwest logo on its brochures with the "knowledge and permission of Qwest" and that "Qwest 'knew or should have known' the very information which it is alleged to have omitted." Id.; Complaint ¶ 27. The complaint alleges that "'Qwest knew or should have known that the Matrix boxes could not perform the functions attributed to them in the brochures" and that "Qwest knew or should have known that the true value of the Matrix boxes did not approach the sums of money contemplated in the 'equipment leases' that bore [its] trademarked logo." Id.; Complaint ¶¶ 32, 35.

31

Purportedly, Qwest had knowledge of true value of the Matrix boxes was aware of the technological limitations of such devices and was aware of the misrepresentations regarding the devices made directly to the class members by NorVergence. Id. Plaintiff also argues that causation is properly plead in the Complaint. Id. at 13. Accordingly, the use of the Qwest trademarked logo and name in connection with NorVergence's promotional material is adequate grounds to establish causation. Id. Class members were induced into signing the Matrix box leases by relying on the "trusted Qwest name." Id. Thus, a causal link is clearly established between Qwest's role in NorVergence's fraudulent scheme and the losses sustained by the Plaintiff. Id. Notwithstanding, Plaintiff argues that the NJCFA is violated by deceptive conduct even in the absence of causally related damages, citing Cox v. Sears Roebuck & Co., 138 N.J. 2, 16, 647A.2d 454 (1994). Id. at 13, n.3.

Moreover, Plaintiff asserts that Qwest may be liable under NJCFA for aiding and abetting in NorVergence's fraudulent scheme. Id. at 14. Although no New Jersey court, either Federal or State, has addressed a claim for aiding and abetting under the NJCFA, the Plaintiff asserts that persuasive authority is available within the district court decision of Armstrong v. Edelson, 718 F. Supp. 1372 (N.D. Ill. 1989) which denied a motion to dismiss a claim for aiding and abetting a consumer fraud violation. Pl. Resp. to Qwest at14. Recognizing the similarities in the text of the NJCFA and the Illinois consumer fraud law, the Plaintiff contends that the Armstrong case is particularity persuasive. Id. at 15.

Next, Plaintiff argues that its negligent misrepresentation claim is properly plead. Id. Although Qwest contends that it had no common law duty to disclose material information to the Plaintiff because it did not maintain a fiduciary relationship or relationship of trust and confidence with those consumers, Plaintiff argues that the registration and or ownership of a trademark gives

rise to a duty to the consumers.  Id. at 16.  In general, trademark owners have a duty to police the

use of its mark for the benefit of the consuming public at large.   Id.  Plaintiff relies on the Eleventh

Circuit decision, Mini Maid Servs. Co. v. Maid Brigade Systems, Inc., 967 F.2d 1516 (11th Cir.

1992) and the Ninth Circuit decision, Kealoha v. E.I. DuPont de Nemours & Co., 82 F.3d 894 (9th

Cir. 1996) in support of its argument that Qwest had a duty to the consuming public at large arising

from its trademark. Id. at 17-18.

Finally, Plaintiff asserts that its claim for unjust enrichment is properly plead since Qwest's

profits increased arguably when NorVergence's sales increased since NorVergence paid Qwest on

a "per-minute" basis.  Plaintiff argues that its unjust enrichment claim raises an issue of fact for a

jury and thus cannot be dismissed at this stage.  Moreover, Plaintiff contends that a party can be

unjustly enrichment without the plaintiff directly conferring a benefit on to the defendant.

**Qwest's Reply**

In its preliminary statement, Qwest argues that the Plaintiff's case boils down to a single

proposition: "because NorVergence used Qwest's trademarks in its allegedly fraudulent scheme,

Qwest should be strictly liable for the consequences." Reply Brief in Further Support of Motion of

Qwest Communications International, Inc. To Dismiss Pursuant to Federal Rule of Civil Procedure

9(b) and 12(b)(6) ("Qwest Reply") at 1.   Plaintiff alleges that Qwest knew or should have known

that the sales of the Matrix boxes were fraudulent and that Qwest had a duty to detect fraud and

disclose it to Wanland's customers since NorVergence was using its trademark.    Id.

Notwithstanding, Qwest reiterates that the agreement between Qwest and NorVergence expressly

prohibited the  use of the Qwest mark in connection with the sale of NorVergence's own products

and services which includes the Matrix box. Id.  The Complaint fails to allege facts that, if proven,

would establish that Qwest authorized NorVergence's use of its mark, that Qwest knew NorVergence was using its mark in connection with the Matrix box or that Qwest knew about the Matrix box. Id. Thus, Qwest argues that the amended complaint fails to state a cause of action against Qwest for violations of the NJCFA, for negligent misrepresentation or unjust enrichment. Id. Arguably, the owner of a trademark should not be liable in tort for the independent misdeeds of a licensee, especially in the instance where the licensee misuses the mark for an unauthorized purpose. Id. Qwest asserts that the only basis of the Plaintiff's claims is "its desire for a deep pocket . . . " Id.

Qwest maintains that the amended complaint fails to plead with particularity the "who, what, when and where" in support of the fraud allegation. Id. at 2. While the Plaintiff refers to NorVergence's marketing and promotional materials which bear the Qwest name, trademark and logo, Qwest emphasizes that no documents evidencing the same were attached to the amended complaint. Id. Moreover, Qwest asserts that the Plaintiff does not allege any facts to establish its knowledge about the Matrix box or NorVergence's fraudulent scheme, but rather solely relies on its own conclusory statements. Id. Plaintiff concedes that Qwest never made any representation to it. Id. Applying the standard under Federal Rule of Civil Procedure 9(b), Qwest argues that the amended complaint does not allege any false statement of Qwest or any knowledge by Qwest to support a claim of knowing non-disclosure under the NJCFA. Id.

Next, Qwest contends that the Qwest-NorVergence agreements should be considered in connection with the instant motion to dismiss. Id. Qwest asserts that a court may consider "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if plaintiff's claims are based on the document." Id. (citing In re Donald J. Trump Casinos Sec. Litig.,

7 F.3d 357, 368 n.9 (3d Cir. 1993), *cert. denied*, 510 U.S. 1178 (1994)).   Qwest states that

NorVergence's misuse of its trademark is core to the Plaintiff's claims.  Id. at 3.  Therefore, the

terms by which NorVergence obtained use of Qwest's marks and the scope of the use, are integral

to defending against the Plaintiff's claim and should be considered at the motion to dismiss stage.

Id.  Accordingly, the allegations set forth in the amended complaint should be read in conjunction

with the agreements between Qwest and NorVergence.  Id.  Such agreements, including the WSA

and the MRA, "expressly prohibited NorVergence from using the Qwest name, trademark and logo

to sell NorVergence products or services."  Id. (citing Carlson Dec. Ex. B ¶ 5, Ex. C ¶ 5, Ex. D ¶ 5).

To the extent that the Qwest mark was misused in connection with NorVergence's marketing

materials, it is argued that NorVergence did so without Qwest's consent and in violation of the

parties' agreements.  Id. at 3-4.

Qwest contends that the amended complaint fails to plead with particularity a violation of

the NJCFA.   Id. at 4.  Notably, in the decisions identified by the Plaintiff whereby an

"unconscionable commercial practice" was found to violate the NJCFA, the egregious conduct also

fell into one of the three types of unlawful practices prohibited by the NJCFA as recognized by the

New Jersey Supreme Court: "unlawful practices, . . . affirmative acts, knowing omissions, and

regulation violations."  Id. (citing Cox v. Sears Roebuck & Co., 138 N.J. 2, 18, 647 A.2d 454

(1994)).  The Plaintiff's claim does not base its NJCFA claim on an affirmative act or statement by

Qwest or a violation of a regulation.  Id.  Rather, such claim is based on Qwest's alleged "knowing

acquiescence in fraudulent use of its name and logo" by NorVergence.  Id. (citing Pl. Resp. to Qwest

at 11).  Any omission by Qwest, however, must have been "knowing" to violate the NJCFA.  Id.

Qwest argues that the Plaintiff failed to demonstrate the "who, what, when and where" requirements of Rule 9(b) to establish that Qwest knew NorVergence misused its trademark to sell the Matrix box. Id. The amended complaint does not allege that Qwest saw NorVergence's promotional sale materials or that Qwest approved the use of its mark in the promotional materials. Id. Unlike the Nortel defendants, Qwest asserts that Wanland alleges no facts that Qwest employees either designed the Matrix box or engaged in joint sale presentations with the Plaintiff. Id. Qwest similarly contends that the amended complaint fails to sufficiently allege that Qwest knew or should have known that NorVergence's promotional materials misrepresented the functions and performance capacity of the Matrix box. Id. at 5. Unlike allegations about the Nortel defendants, Qwest asserts that it had no knowledge of the existence of the Matrix box. Id. Considering the Plaintiff's failure to plead a knowing omission of material fact with particularity, Qwest asserts that the claim under the NJCFA should be dismissed.

Qwest further contends that the amended complaint otherwise fails to state a claim under the NJCFA. The amended complaint alleges that Qwest knowingly failed to disclose to NorVergence's customers that (I) the functions and performance of the Matrix box did not conform to the promotional materials, and that (ii) by assigning the Matrix box leases, customers would be forced to continue paying for the Matrix boxes after telecommunication service was suspended. Id. at 6. Although no direct customer relationship existed between the Plaintiff and Qwest, the amended complaint recognizes an "indirect" relationship as NorVergence purchased Qwest services at wholesale and subsequently resold such services to the Plaintiff with the Matrix box. Id. Unlike the Nortel defendants, Qwest emphasizes that Wanland does not allege that Qwest was involved

with the design or marketing efforts of the Matrix box except by NorVergence's unauthorized use of Qwest's marks. Id.

The underlying grounds of the NJCFA claim is that Qwest knew NorVergence was making fraudulent statements about the Matrix box and that Qwest, as a supplier of wholesale telecommunications services, had a duty to contact the Plaintiff and warn them about NorVergence's misrepresentations about a product that Qwest did not design, manufacture or sell. Id. Plaintiff is thus attempting to impose liability on Qwest solely because NorVergence misused its name and mark. Id.

It is Qwest's position that the amended complaint fails to allege any facts that, if proven, would establish that Qwest knew about NorVergence's assertions relating to the Matrix box, that Qwest knew the users of its services had leased a Matrix box or even that the Matrix box existed. Id. at 7. Qwest similarly argues that the amended complaint fails to allege facts that, if proven, would establish that it knew NorVergence assigned the Matrix box leases to third-party holders in due course. Id. Next, Qwest highlights that it did not supply the Plaintiff with the Matrix boxes but was merely a wholesale supplier of telecommunication services. Id. Arguably, Qwest should not be liable for a "retailer's fraudulent claims about a product that Qwest did not design, manufacture or sell to the retailer." Id. Rather, Qwest asserts that "a remote supplier may be liable only to the extent that its 'products are passed on to a buyer and [its] representations are made to or are intended to be conveyed to the buyer.'" Id. (citing Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 226 N.J. Super. 200, 211 (App. Div. 1988), aff'd, 118 N.J. 249, 571 A.2d 294 (1990)).

37

Qwest maintains that a wholesaler is not the insurer of the retailers's integrity and should not be required to investigate whether the retailer is misusing the wholesaler's product and reputation. Id. at 8.   Qwest further contends that the amended complaint fails to assert that Qwest caused damage to Plaintiff. Id.  Although the amended complaint alleges that Plaintiff was "induced to sign the Matrix box 'leases' by invocation of the trusted Qwest name" Qwest argues that NorVergence invoked Qwest's name without its consent and in violation of the parties' express agreements.  Id. (citing Pl. Resp. to Qwest at 13).

Since the complaint does not demonstrate that Qwest knowingly omitted to reveal NorVergence's fraud to its consumer, Qwest argues that the complaint fails to plead damages.  Id. Finally, Qwest provides that the amended complaint does not demonstrate that Qwest is vicariously liable, as an aider and abettor, of NorVergence's fraudulent scheme.  Id. at 9.  At the outset, no New Jersey court has held a party liable for aiding and abetting a violation of the NJCFA.  Id.  Moreover, Qwest states that the language of the cited Illinois consumer fraud statute is broader than the NJCFA which may provide a basis for aider and abettor liability.  Id. at 9-10.[4]  Notwithstanding, even if this Court were to apply the Illinois decision, Armstrong v. Edelson, 718 F. Supp. 1372 (N.D. Ill. 1989), Qwest argues that the facts of the case are distinguishable since in  Armstrong, Qwest posits that sufficient facts were pled that the finance companies knew that the contractors from whom it purchased  the consumer paper were engaged in fraud.  Id. at 10.

_____

[4]Here Qwest states "While the New Jersey statute prohibits any "unconscionable commercial practice, deception, fraud, false pretense, false promise, or the knowing concealment, suppression or omission of any material fact with intent that others rely upon such concealment" N.J.S.A. 56:8-2, the Illinois statute prohibits all "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to" what the New Jersey statute prohibits. Id. at 9-10 ( citing 815 Ill. Con. Stat. 505/2).

Unlike the finance companies in <u>Armstrong</u>, Qwest asserts that there are no allegations that, if proven would show that it knew of NorVergence's alleged fraud or that Qwest directly benefitted from such fraud. <u>Id.</u> Qwest did not purchase or receive any payments under the leases nor did Qwest sell services directly to Plaintiff. <u>Id.</u> Pursuant to the WSA , NorVergence was obligated to pay for the telecommunication services purchased from Qwest regardless of whether the services were resold at retail. <u>Id.</u> at 11(citing <u>Carlson Decl</u>. Ex. B, ¶ 13.2, Ex. C, ¶ 13.2). Thus, Qwest arguably had no financial stake in NorVergence's fraudulent scheme. <u>Id.</u> Although NorVergence used Qwest's logo to market the Matrix box, Qwest argues that this relationship alone is insufficient to support a claim under NJCFA that it knowingly failed to disclose a material fact with an intent to defraud the Plaintiff. <u>Id.</u>

Qwest similarly argues that the Plaintiff fails to state a claim for negligent misrepresentation. <u>Id.</u> Plaintiff's claim for negligent misrepresentation is based on the premise that Qwest maintained a duty to "prevent NorVergence from making unauthorized, fraudulent misuse of the Qwest trademark and logo." <u>Id.</u> To the contrary, Qwest provides that a "licensor of a trademark is not liable for torts committed by the licensee relating to the sale of trademarked goods." <u>Id.</u> Qwest argues that "a 'standard trademark agreement, in and of itself, does not establish an affirmative duty to inspect what could result in tort liability to third parties.'" <u>Id.</u> at 11-12 (citing <u>In re TMJ Implants Products Liab. Litig.</u>, 113 F.3d 1484, 1494 (8th Cir. 1997). Qwest further asserts that trademark owners are not liable for the defective quality of trademarked good unless the trademark owners were involved in the design, manufacture or sale of the defective goods or claimed to be the manufacturer. <u>Id.</u> at 12 (citing <u>In re TMJ Implants Products Liab. Litig.</u>, 880 F. Supp. 1311, 1321 (D.Minn. 1995), <em>aff'd</em>, 113 F.3d 1484 (8th Cir. 1997)); <u>Kealoha v. E.I. DuPont de Nemours & Co.</u>,

844 F. Supp. 590, 595-596 (D. Haw. 1994), *aff'd*, 82 F.3d 894 (9th Cir. 1996); <u>Burket v. Petrol Plus

of Naugatuck</u>, 579 A.2d 26, 35 (Conn. 1990); <u>Jackson v. Coldspring Terrace Prop. Owners Ass'n</u>,

939 S.W.2d 762, 768 (Tex. App. 1997)).    Qwest argues that it is undisputed that Qwest did not

design, manufacture or sell the Matrix box or claim that it did, nor did it affirmative communicate

with Plaintiff about such product. <u>Id.</u> at 12.

In response to the so-called "duty to police a trademark" recognized with the Plaintiff's

papers, Qwest maintains that such duty is not a rule of tort liability but rather arises from the

principle that such owner may lose ownership of a mark if it fails to oversee the licensee's product.

<u>Id.</u> at 12-13 (citing *2 McCarthy on Trademarks and Unfair Competition § 18.48).*  Upon reviewing

the case law cited by Plaintiff, Qwest asserts that Plaintiff "cites no case in which a licensor without

knowledge of its licensee's misconduct had been held liable even for trademark infringement, much

less for the licensee's fraud." <u>Id.</u> at 13.   Moreover, courts have recognized that the duty to police a

mark "does not automatically saddle a licensor with responsibility under state law of a principal for

his agent." <u>Id.</u> (citing <u>Mini Maid Svcs. Corp.</u>, 967 F.2d at 1520.)  In the instant matter, Qwest argues

that the WSA expressly prohibited NorVergence from using the Qwest mark in connection with the

sale of its own goods. <u>Id.</u> at 14.  It is Qwest's contention that "[b]ecause there is no duty of care to

control the unauthorized, fraudulent misuse of a trademark, the Amended Complaint fails to state

a claim for negligent misrepresentation against Qwest." <u>Id.</u>

Qwest further argues that the amended complaint fails to state a cause of action for unjust

enrichment. <u>Id.</u>  Plaintiff did not confer a benefit upon Qwest whereby it would be unjust for Qwest

to retain such benefit absent consideration. <u>Id.</u> (citing <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J.

539, 554 (1994)).  Qwest emphasizes that the amended complaint fails to allege any facts that, if

40

proven, would show that Qwest received any profits, directly or indirectly, from the proceeds of the Matrix box leases.  Id.  As set forth in the WSA, NorVergence was obligated to pay Qwest regardless of whether it received payment from Plaintiff or other customers.  Id. (citing Carlson Dec. Ex. B, ¶ 13.2, Ex. C, ¶ 13.2).  Without any evidence of a direct relationship between Qwest and the Plaintiff, Qwest argues that there is no claim for unjust enrichment.  Id. at 15.  Qwest neither owes anything or received anything from Plaintiff.  Id.  "As a wholesale supplier, [Qwest] looked only to NorVergence for payment, and NorVergence has failed to pay Qwest more than $34 million it owed for telecommunication services.  Wanland had no relationship with Qwest, NorVergence's wholesale supplier, and therefore conferred no benefit upon Qwest."  Id.

## C.    Robert J. Fine's Motion for Summary Judgment

On April 17, 2005, Robert J. Fine filed a motion for summary judgment on all counts set forth in the amended complaint.  Notably, Fine asserts he  was not an officer, director or shareholder of the Debtor.  Brief of Defendant Robert J. Fine in Support of His Motion for Summary Judgment ("Fine Br.") at 1 (quoting Certification of Robert J. Fine in Support of His Motion for Summary Judgment ("Fine Cert."), ¶¶ 11, 12, 14).  Fine was an employee of the Debtor from April 2003 through June 2004, whose job responsibilities "pertained exclusively to maintaining the Company's banking relationships."  Id. (quoting Fine Cert. ¶¶ 2, 7, 8, 10).  Fine asserts that he had "absolutely no involvement with sales made to consumers of NorVergence's telecommunications products and services.  Id. at 5 (quoting Fine Cert. ¶ 6).

In his motion for summary judgment, Fine contends that he is entitled to summary judgment on all counts because, based on undisputed facts, Wanland's claims imputing the Debtor's liability for the alleged torts on Fine, not an officer, director, or shareholder of the Debtor, but a mere

41

employee, cannot be sustained. Fine Br. at 2. Fine claims he was not even a NorVergence employee at the time Plaintiff and NorVergence entered into the equipment leases of the Matrix boxes and that he was hired by NorVergence as of April 2003 while the subject Equipment Lease is dated January 23, 2003. Fine also states that at the time he was hired, NorVergence had an existing business plan that did not change during his period of employment. Fine Cert. at ¶ 4. Accordingly, NorVergence maintained a separate sales staff for marketing of its products. Fine Br. at 6. Fine asserts that he had no interaction or contact with the NorVergence telecommunications sales staff. Id. In contrast to the assertion that Fine was unjustly enriched, Fine highlights that he has not received a paycheck from NorVergence since June 2004, that two of Fine's paychecks bounced and that insurance premiums for Fine's health care coverage were withheld. Id. at 6-7.

With respect to Count One of the complaint alleging violations of NJCFA, Fine contends that he is entitled to summary judgment because he cannot conceivably be held liable for the Debtor's alleged consumer fraud under the test set forth in Kugler v. Koscot Interplanetary, Inc., 120 N.J. Super. 216, 257, 293 A.2d 682 (Ch. Div. 1972). Id. at 9. Fine asserts that Kugler stands for the proposition that an "individual operating as an officer, employee or agent of a business entity may be liable under [NJCFA], but only '[w]hen a fraud is committed in the name, and under the cover of a corporation, by persons having the right to speak for it [and] for their personal gain and benefit.'" Id. at 9 (citing Kugler, 120 N.J. Super. at 257.) Further, Fine discusses the application of the Kugler test in subsequent case law. Fine Br. at 9-12. Fine cites In re Fleet, 95 B.R. 319, 322 (E.D. Pa 1989), where Fine urges the Bankruptcy Court recommended, and the District Court adopted, "the dismissal of a [NJCFA] claim against an individual defendant" holding that her "mere status as an employee . . . and even [her] direct contact with [p]laintiffs . . . was insufficient to

42

establish [her] liability under [NJCFA]." Id. at 9-10.  In contrast, Fine highlights that in the same

case, another individual, a co-defendant, who was the founder, president and sole shareholder of the

company, was found personally liable under NJCFA because he "himself was in charge of the

marketing and advertising which [the Court] ha[s] found misleading."  Id., at 10.  Fine also cites

Lingar v. Live-in Companions, Inc., 300 N.J. Super 22, 692 A.2d 61 (App. Div. 1997), where the

Appellate Division reversed the lower court's dismissal of NJCFA claims against an individual who

was the "owner and director" of the corporation and who directly "made statements to the plaintiffs

that the court found may have violated [NJCFA]." Fine Br. at 11.  On the other hand, the Appellate

Division in Lingar affirmed the dismissal of NJCFA claims against the individual defendant's

husband, an officer of the corporate defendant, reasoning that while "[h]e was named vice-president,

secretary and treasurer of the corporation 'on paper' when the business was incorporated, . . . he

remained largely inactive," and "no evidence was presented indicating that [he] took part in any of

the activities leading" to the alleged negligent hiring or consumer fraud.  Fine Br.  at 12.  Applying

the Kugler test, Fine reasons that he cannot be liable for Debtor's alleged consumer fraud under

NJCFA because, similarly to the individual defendant in Fleet, supra, he was not an officer, director,

or shareholder of the Debtor, "but a mere employee . . . engaged in matters wholly unrelated to the

sale or marketing of [the Debtor's] products to consumers." Fine Br. at 16.  Also, Fine reasons that,

similarly to one of the individual defendants in Lingar, supra, who was an officer of the corporation,

but did not participate in the activities found by the court to be fraudulent, he should not be held

personally liable for the Debtor's alleged consumer fraud because there is no evidence of his

participation in any activities giving rise to the allegations under NJCFA.   Fine Br. at 17.

Additionally, Fine contends that it is undisputed he was not even employed by the Debtor and had

no connection whatsoever to the Debtor at the time the Equipment Lease between the Plaintiff and NorVergence was executed. Id. at 16.

As to Count Two of the complaint alleging negligent misrepresentation, Fine contends that he is entitled to summary judgment because he cannot be held liable for the Debtor's alleged negligent misrepresentation under the "participation theory" set forth in Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 303, 788 A.2d 268 (2002). Id. at 19-20. The Saltiel Court stated that "a predicate to [personal] liability [of a corporate officer] is a finding that the corporation owed a duty of care to the victim, the [corporate] duty was delegated to the officer and the officer breached the duty of care by his own conduct." Fine Br. at 19 (citing Saltiel, 170 N.J. at 303 ). Additionally, Fine cites Metuchen Savings Bank v. Pierini, 377 N.J. Super. 154, 162, 871 A.2d 759 (App. Div. 2005) which requires "sufficient evidence of the officer's involvement in the tortious conduct" to be held personally liable. Fine Br. at 20. Fine contends that it is undisputed that he was never an officer of the Debtor rendering the "participation theory" of Saltiel inapplicable to him. Id. Accepting, arguendo, that mere employees who are not corporate officers can be held personally liable for negligent misrepresentation, Fine argues that he still cannot be held personally liable because, while a duty of care was owed to the victims by the Debtor, it is undisputed that no such duty was delegated to him since his position with the Debtor was limited to the banking end of the business, completely unrelated to sales and marketing. Id. Finally, Fine contends that it is undisputed he was in no way involved in any sales or marketing activities of the Debtor and thus could not have breached any duty of care by his own conduct. Id. at 20-21.

As to Count Three of the complaint alleging unjust enrichment, Fine contends that he is entitled to summary judgment because he cannot be held liable for the Debtor's alleged unjust

enrichment under the elements set forth in <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 555, 641

A.2d 519 (1994), requiring the plaintiff to show that it "expected remuneration from the defendant

at the time it performed or conferred a benefit on defendant, and [that] the failure of remuneration

enriched defendant beyond its contractual rights." <u>Fine Br.</u> at 23.  Fine contends that "the doctrine

of unjust enrichment has no conceivable application to [him]" since, as a matter of law, Wanland

could not expect remuneration from Fine because Fine was not in any way involved in sales or

marketing activities of the Debtor and was not even employed by the Debtor at the time the

Equipment Lease at issue here was entered into.  <u>Id.</u>  Further, Wanland did not perform or confer

a benefit on Fine as a matter of law, since Fine was merely a salaried employee of the Debtor, not

a shareholder who derived a benefit from the corporate profit.  <u>Id.</u> at 23-24.

**Plaintiff's Opposition to Fine's Motion for Summary Judgment**

In response to the instant Motion, Wanland contends "[i]t is axiomatic that when discovery

is incomplete, summary judgment is not appropriate."  <u>Plaintiff's Opposition to Defendant Robert

J. Fine's Motion for Summary Judgment ("Pl. Resp. to Fine ")</u> at 5.  In support, Plaintiff cites Fed.

R. Civ. P. 56(f) that "authorizes the Court to 'refuse the application for judgment' or 'order a

continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had.'"

<u>Id.</u>  Additionally Plaintiff cites <u>Croker v. Applica Consumer Prods., Inc.</u> No. 05-3054 (RBK), 2006

WL 626425 at *3 (D.N.J. March 10, 2006), where U.S. District Court Judge Kugler applied the

underlying principle of Fed R. Civ. P. 56(f), holding that denial of summary judgment as premature

"provides for more just adjudication of disputes by ensuring that parties are not 'railroaded' by a

premature motion for summary judgment.  <u>Pl. Resp. to Fine</u> at 5.  Accordingly, Wanland contends

that Fine's motion is premature and summary judgment is not appropriate because Wanland did not

45

have a reasonable opportunity to conduct discovery.  Id.  Wanland further cites the following cases to illustrate the inappropriateness of summary judgment at this stage of litigation: Gooden v. Township of Monroe, No. 05-2472 (RBK), 2006 WL 561916 at *2 (D.N.J. March 7, 2006) (denying motion for summary judgment as premature "because [p]laintiff has not had an opportunity to obtain important relevant evidence through discovery channels"); Croker, 2006 WL 626425 at *4 (denying motion for summary judgment where plaintiffs "had not yet engaged in discovery" with the moving defendant).  Pl. Resp. to Fine  at 6.

In response to Fine's contention with respect to Count One of the complaint alleging violations of the NJCFA, Wanland contends that a genuine issue of material fact exists because, under Kugler and Fleet, personal liability can be established regardless of title within the corporation if the defendant's "involvement and the direction of corporation[...] was so complete as to render the corporation[...] [his] alter ego[...]."  Id.  Wanland discusses Fleet and Lingar, cited by Fine to illustrate the application of the Kugler test, and concludes that both cases are not applicable to the instant Motion because in both these cases, there was substantial discovery taken, and trial on the issue of individual liability.  Id. at 7-8.  Based on Fleet and Lingar, Wanland argues that to establish personal liability, an inquiry should be made into the evidence of individual participation in the alleged consumer fraud and that no conclusions should be made based on the individual's formal title alone.  Id. at 8.  Wanland further contends that a genuine issue of material fact exists since its investigation reveals material questions regarding Fine's role in the alleged violations of NJCFA. Id. at 9.  In support of this contention, Wanland submits a declaration of Lisa J. Rodriguez, Esq. attaching the Debtor's press releases identifying Fine as "president of [the Debtor's] wholly owned financial services subsidiary," NorVergence Capital, LLC, as well as numerous internet-based

46

industry publications and various websites discussing Fine's involvement in the Debtor's activities. Id. at 9-10. Finally, Wanland contends that Fine's assertion that the Debtor had an "existing business plan" at the time Fine was hired is irrelevant because "New Jersey case law does not require that an individual conceive of a fraudulent scheme in order to be liable for participating in it." Id. at 11. Wanland further contends that Fine's role in the "banking end of the business" arguably included participation in the fraudulent activities of the Debtor by selling the so-called leases to third-party leasing companies knowing that the so-called leases purported to take away certain rights from customers in an event of a likely service failure. Id.

In response to Fine's contention with respect to Count Two of the complaint alleging negligent misrepresentation, Wanland contends that a genuine issue of material fact exists according to the "participation theory" set forth in Saltiel, requiring that the defendants have such close relationship to the enterprise, as a result of which the plaintiff allegedly suffered injuries, "so that it may be fairly said that they did participate or cooperate therein." Saltiel, 170 N.J. at 307. Wanland states that in Saltiel, parties had an opportunity to conduct discovery focused on personal liability of individual defendants prior to bringing a motion for summary judgment. Pl. Resp. to Fine at 12. Accordingly, Wanland contends that here similar discovery must be conducted before the motion for summary judgment is ripe. Id. Finally, Wanland contends that the evidence it presented in Section II.B of its brief, consisting of the Debtor's press releases as well as numerous internet-based industry publications and various websites discussing Fine's involvement in the Debtor's activities is sufficient to raise an issue of material fact relating to Fine's participation in the NorVergence scheme, without the benefit of discovery. Id.

In response to Fine's contention with respect to Count Three of the complaint alleging unjust enrichment, Wanland contends that a genuine issue of material fact exists notwithstanding the fact that Fine argues that Wanland could not have conferred any benefit upon him personally since he was merely a salaried employee with no equity interest in the Debtor.  Id.  Wanland contends that its preliminary investigation reveals that Fine may have been president of NorVergence Capital, LLC, the Debtor's wholly-owned subsidiary and that discovery may reveal his equity interest in the subsidiary.  Id.  Wanland further contends that Fine's assertions with respect to lack of an equity interest in the Debtor itself are not proven by discovery.  Id.  For the foregoing reasons, Wanland argues that summary judgment is not appropriate.  Id. at 13.

**Fine's Reply in Further Support of his Motion for Summary Judgment**

In his reply brief, Fine contends that Wanland has not established there is  a genuine issue of material fact because it does not challenge the fact that Fine was hired by the Debtor in April 2003, some two months subsequent to January 23, 2003 execution of the Equipment Lease.  Reply Brief of Defendant Robert J. Fine in Further Support of His Motion for Summary Judgment ("Fine Reply") at 1.  Fine argues that he cannot be held liable for the Debtor's alleged fraud, negligent misrepresentation or unjust enrichment if the conduct giving rise to those allegations occurred prior to Fine's affiliation with the Debtor.  Id. at 1-2.  Fine further argues that the documents referred to in Wanland Opposition are "incompetent and inadmissible," for purposes of this motion, and even if they were competent and admissible, they fail to establish a genuine issue of material fact with respect to the date of Fine's hiring by the Debtor.  Id., at 2.

Fine argues that summary judgment should be granted notwithstanding the arguments set forth in the Wanland Opposition because under Fed. R. Civ. Pro. 56(e), affidavits opposing summary

judgment should be based on personal knowledge, and the <u>Declaration of Lisa J. Rodriguez, Esq.</u> <u>"Rodriguez Decl."</u>) submitted by Wanland did not contain any factual assertions that were based on personal knowledge. <u>Id.</u> at 4. Fine contends that the Rodriguez Decl. contained press releases and various internet postings, with respect to which Ms. Rodriguez does not assert any personal knowledge. <u>Id.</u> Further, Fine contends that documents annexed to the Rodriguez Decl. constitute inadmissible hearsay under Fed. R. Civ. P. 56(e), "and thereby cannot serve to establish a genuine issue of material fact necessary to preclude the grant of summary judgment." <u>Id.</u> at 5.

Further, Fine argues that even if documents submitted as exhibits to the Rodriguez Decl. were admissible, they do not raise a genuine issue of material fact with respect to the Fine's lack of affiliation with the Debtor during the time the events giving rise to the putative claims of fraud and negligent misrepresentation took place. <u>Id.</u> at 7. Additionally, Fine argues that, assuming the actual period of time of his employment by the Debtor was relevant to Wanland's claims, nothing in the press releases attached to the Rodriguez Decl. establishes that Fine was responsible for marketing or sales to consumers of any telecommunications products or services which give rise to Wanland's claims. <u>Id.</u> at 8.

First, Fine argues that the May 28, 2003 press release by the Debtor identifying Fine as the "new Director of Bank Relations" accurately states his position and date of employment with the Debtor and does not establish an issue of material fast as to lack of his involvement in sales or marketing to the Debtor's customers. <u>Id.</u> at 9. <u>Fine Cert.</u>, ¶¶ 6,7, <u>Supplemental Certification of</u> <u>Defendant Robert J. Fine in Support of His Motion for Summary Judgment ("Fine Supp. Cert.")</u> ¶¶ 8,9 Second, Fine argues that the August 22, 2003 press release by the Debtor announcing hiring of two persons in the company's Banking Relations Department to assist him also does not establish

an issue of material fact as to lack of his involvement in sales or marketing to the Debtor's customers. Id. at 9-10. Third, Fine argues that the March 24, 2004 press release by the Debtor announcing the establishment of a NorVergence subsidiary, NorVergence Capital LLC, to finance equipment leases for subsequent sale to various third parties is irrelevant because (1) the venture was aborted due to financial difficulties that led to the Debtor's bankruptcy filing; (2) Fine's employment with the Debtor was terminated on July 1, 2004, and the subsidiary was scheduled to begin operations by June 30, 2004; and (3) the press release does not establish an issue of material fact as to Fine's lack of involvement in sales or marketing to the customers. Id. at 10-11. Fine Cert., ¶¶ 5-7.

Finally, Fine contends that Plaintiff's Affidavit Pursuant to Fed. R. Civ. P. 56(f) ("Pl. Rule 56(f) Aff.") cannot preclude the grant of summary judgment because "the record is clear that no amount of discovery will enable [Wanland] to recover against . . . Fine." Id. at 13. In support of this contention, Fine cites Wright & Miller, 10B Fed. Prac. & Proc. 3d § 2741, stating that "if discovery sought appears irrelevant to the issues to be adjudicated" or if based on "a mere 'hope' or 'hunch' that evidence creating an issue of fact will emerge," an affidavit under Fed. R. Civ. P. 56(f) will not preclude the grant of summary judgment. Id. Fine argues that, since the date of the execution of the January 23, 2003 Equipment Lease, the dates of Fine's employment with the Debtor, April 2003 through June 2004, and the fact that the putative claims against Fine arise out of the January 23, 2003 Equipment Lease are undisputed, "no amount of discovery will create a cause of action against . . . Fine." Id. at 14. Accordingly, Fine argues that summary judgment should be granted and all three counts against him should be dismissed with prejudice. Id., p. 15. Additionally, Fine adds in a footnote that Wanland did not comply with L. Civ. R. 56.1 by failing to file a responding statement in its opposition papers. Id., n.2.

**D.      September 13, 2006 Hearing and Supplemental Pleadings**

On September 13, 2006, the Court conducted a hearing on the Nortel Defendants' Motion to Dismiss, Qwest's Motion to Dismiss and Mr. Fine's Motion for Summary Judgment. During the course of the hearing counsel for the Nortel Defendants repeatedly stressed what they asserted were significant pleading deficiencies in the Plaintiff's Complaint as to the factual connections between the NorVergence Defendants and the Nortel Defendants. Among other alleged flaws the Nortel Defendants argued that Plaintiff failed to adequately plead the existence of a duty that the Nortel Defendants owed to the Plaintiff. As all of the asserted causes of action against the Nortel Defendants stem from the existence of a duty, counsel asserted that the complaint must be dismissed in its entirety. Qwest again asserted during the hearing that the alleged connection between it and the purported fraudulent scheme by the NorVergence Defendents was even further removed than the alleged connection between Nortel and the NorVergence Defendants and must be dismissed under Rule 12(b)(6) and Rule 9.

With regard to Mr. Fine's motion for summary judgment, counsel for Mr. Fine argued that no issues of material fact existed as to Mr. Fine's role at NorVergence and that as a matter of law Mr. Fine could not be held liable under any of the legal claims asserted against him. Although the Plaintiff had yet to conduct discovery of Mr. Fine to test the sufficiency of the claims against him, counsel for Mr. Fine maintains that the Court should grant summary judgment dismissing all claims against Mr. Fine.

At the conclusion of the September 13, 2007 Hearing the Court reserved decision on all three pending motions. While these motions were still under advisement, the United States Supreme Court issued its opinion in Bell Atlantic v. Twombly ("Twombly"), 127 S. Ct. 1955 (2007), which

addressed the Rule 12(b)(6) standard for sufficient pleading of facts.  In light of <u>Twombly's</u>

potential impact on the pending motions to dismiss, which will be discussed further below, the Court

reopened the record on this matter to afford the parties an opportunity to address the impact, if any,

that <u>Twombly</u> should have on the instant motions to dismiss.   On August 15, 2007 the Nortel

Defendants and Qwest filed supplemental pleadings regarding <u>Twombly</u>.  Mr. Fine joined in the

supplemental pleading filed by Qwest.

The Nortel Defendants argue that <u>Twombly</u> established a new plausibility standard for Rule

12(b)(6) motions which "is fatal to the claims against Nortel in this matter." <u>Nortel Networks</u>

<u>Limited And Nortel Network Inc.'s Submission Of Supplemental Authority</u> at 3.  In the Nortel

Defendants' view, the Plaintiff has failed to allege facts that demonstrate the existence of a duty

owed by Nortel, let alone that any duty was breached. <u>Id.</u>.  As each cause of action asserted against

the Nortel Defendants requires a legally actionable duty they conclude the complaint does not "raise

a right to relief above the speculative level" and must be dismissed in accord with <u>Twombly</u>. <u>Id</u>.

In similar fashion, Qwest argues that <u>Twombly</u> is fatal to the Plaintiff's complaint as in

Qwest's view, "[t]he Complaint in this case alleges no facts whatsoever that, if proven would show

that Qwest knew anything about the Matrix Box scheme or had any reason to know of it.  It merely

asserts in conclusory fashion, that Qwest 'knew or should have known' that the Matrix Box would

not do what the NorVergence Defendants told NorVergence's customers it would."  See <u>Qwest</u>

<u>Letter Memorandum dated August 14, 2007</u>, p. 3 (citing <u>Amended Complaint</u>, ¶ 32).  Qwest again

reiterates its position that the alleged link between it and the Debtor is even further removed than

the alleged link between the Debtor and the Nortel Defendants.  In Qwest's view the Plaintiff's

Complaint fails plead plausible facts which demonstrate a connection between itself and the

NorVergence Defendants.  As such, Qwest concludes that under <u>Twombly</u> the Plaintiff's Complaint fails to provide sufficient factual enhancement to rise to the level of plausible and therefore must be dismissed in its entirety as to Qwest.

Mr. Fine, while acknowledging that the <u>Twombly</u> decision addresses motions to dismiss. However, uses the opportunity to argue that <u>Twombly</u> reinforces the proposition that assertions of fraud have a higher pleading standard and must be supported by specific facts.

On August 24, 2007, Plaintiff filed a supplemental pleading addressing <u>Twombly</u> and responding to the Qwest, Nortel and Fine submissions.  <u>Plaintiff's Supplemental Letter Brief Regarding Bell Atlantic Corp. v. Twombly    , US    , 127 S.Ct. 1995 (May 21, 2007)</u>. Plaintiff asserts that the <u>Twombly</u> decision does not impact on this Court's consideration of the pending motions.  First Plaintiff argues that <u>Twombly</u> does not change the federal pleading standards but rather clarifies those standards by retiring the "no set of facts" language used in <u>Conley v. Gibson,</u> 78 S. Ct. 99 (1957).  <u>Id.</u> at p. 1.   Plaintiff cites <u>United States v. Harchar</u>, No 1:06-cv-2927, 2007 WL 1876510 (N.D. Ohio June 28, 2007); <u>Motino v. Toys "R" Us Inc.,</u>No. 06-370 (SRC), 2007 WL 2123698 (D.N.J. July 19, 2007) and <u>Stevenson v. Carroll</u>, 495 F.3d 62(3d Cir. 2007) as support that the general federal pleading standards have not changed.  <u>Id</u>.

Plaintiff further posits that to the extent <u>Twombly</u> does impact on pleading standards it only affects the narrow area of federal antitrust conspiracy law where facts supporting the "plausibility" of a conspiratorial agreement are now clearly required, and plaintiff herein is alleging causes of action under state law which do not involve antitrust claims.  <u>Id</u>. at 2.

Finally, Plaintiff argues that even if <u>Twombly</u> is interpreted as altering the pleading standard, plaintiff has alleged sufficient facts, including an actual partnership among defendants, and specific agreements and programs, to withstand the higher standard. <u>Id</u>. at 2-3.

In addition to addressing <u>Twombly</u>, both Plaintiff and Defendants repeat arguments in their supplemental pleadings which have been previously raised in their motion papers and which have been already addressed in this opinion.

<u>LEGAL ANALYSIS</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012(b), a party may move to dismiss a complaint for failure to state a claim upon which relief may be granted. A motion made under Rule 12(b)(6) challenges the legal sufficiency of a claim in order to determine whether it should proceed. <u>Morris v. Azzi</u>, 866 F.Supp. 149, 152 (D.N.J. 1994). "The purpose of the rule is to allow the court to eliminate actions that are fatally flawed in their legal premise and destined to fail, and thus spare the litigants the burdens of unnecessary pretrial and trial activity." <u>Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys.</u>, 988 F.2d 1157, 1160 (Fed. Cir. 1993), *reh'g en banc denied*.

The United States Supreme Court recently provided clarification on the Rule 12(b)(6) standard in <u>Bell Atlantic Corporation et al. v. Twombly</u>, 127 S. Ct. 1955 (2007). In <u>Twombly</u>, the Supreme Court granted "certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct." <u>Id</u>. at 1963 (citing 126  S. Ct. 2965, 165 L.Ed.2d 949 (2006)). As the Supreme Court explained, the <u>Twombly</u> case presented "the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act. Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the

54

pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Twombly, 127 S. Ct. At 1964-65. In addressing this question the Twombly Court rejected the language previously used by the Court in Conley v. Gibson, 355 U.S. 41, 47 (1957) which provided that "[i]n appraising the sufficiency of the complaint, we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

In addressing the Conley Court's formulation of the Rule 12(b)(6) standard, the Twombly Court expressed concern that Conley's "no set of facts" language "can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read Conley in some such way when formulating its understanding of the proper pleading standard". Twombly, 127 S. Ct. at 1968.

The Twombly Court explained that "[o]n such a focused and literal reading of Conley's 'no set of facts,' a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." Id. It was in this context of disavowing such an overly narrow and literal interpretation of the Rule 12(b)(6) standard that the Twombly Court found the following:

> *Conley's* 'no set of facts' language has been questioned, criticized, and explained away long enough. ....[T]his famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."

Twombly, 127 S.Ct at 1969.  As a proper restatement of the Rule 12(b)(6) standard the Twombly

Court stated that

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need
> detailed factual allegations, a plaintiff's allegation to provide the 'grounds' of his
> 'entitle[ment] to relief' requires  more than labels and conclusions, and a formulaic
> recitation of a cause of action's elements will not do.  Factual allegations must be
> enough to raise a right to relief above the speculative level on the assumption that all
> of the complaint's allegations are true."

Twombly, 127 S.Ct. at 1959.  In applying this formulation to the antitrust complaint before it the

Twombly Court  explained that it was not requiring heightened fact pleading of specifics, but only

enough facts to state a claim to relief that is plausible on its face.  The Court in Twombly ultimately

dismissed the plaintiffs' complaint because, in the Court's words, "the plaintiffs here have not

nudged their claim across the line from conceivable to plausible..."  Twombly, 127 S.Ct. at 1974.

Courts throughout the country are currently engaged in assessing the impact of the Twombly

Court's retirement of Conley's "no set of facts" language.  Some courts have taken the view that

whatever adjustment in pleading standards results from Twombly, "is limited to cases where massive

discovery is likely to create unacceptable settlement pressures."  See Iqbal v. Hasty, 490 F.3d 143,

157 (2d Cir. 2007).  The Court of Appeals for the Third Circuit in applying Twombly has explained

that the role of a court in considering whether the complaint survives a Rule 12(b)(6) motion is to

"review whether it 'contains either direct or inferential allegations respecting all the material

elements necessary to sustain recovery under *some* viable legal theory."  Haspel v. State Farm

Mutual Automobile Ins. Co., 241 Fed. Appx. 837, 839 (3d Cir. 2007)(quoting Twombly, 127 S.Ct.

at 1969).  Courts have determined that in light of Twombly a "court should look to the face of the

complaint and decide whether, taking all of the allegations of fact as true and construing them in a

light most favorable to the nonmovant, plaintiff has alleged "enough facts to state a claim for relief

56

that is plausible on its face." Stillings v. Correctional Medical Services, Inc., No. 06-4888 (RMB),

2007 WL 2123669, at *3 (D. N.J. July 20, 2007)(quoting Twombly, 127 S.Ct. at 1974).  "A

pleading's factual allegations are thus evaluated for sufficiency under a 'plausibility standard.'

Motino v. Toys "R" US, Inc., No. 06-370 (SRC), 2007 WL 2123698, at *1 (D.N.J. July 19,

2007)(citing Twombly, 127 S.Ct. at 1968).  "This standard 'calls for enough fact to raise a

reasonable expectation that discovery will reveal evidence' that the pleader is entitled to relief." Id.

(citing Twombly, 127 S.Ct at 1965).  The burden of demonstrating that dismissal is appropriate still

rests on the movant.  See In re Intel Corp. Microprocessor Antitrust Litigation, 496 F.Supp. 2d 404,

408 (D.Del. 2007).

    In a recent decision, the Third Circuit Court of Appeals analyzed Twombly as follows:

> The issues raised by Twombly are not easily resolved, and likely will be a source of
> controversy for years to come. Therefore, we decline at this point to read Twombly
> so narrowly as to limit its holding on plausibility to the antitrust context. Reading
> Twombly to impose a "plausibility" requirement outside the § 1 context, however,
> leaves us with the question of what it might mean. "Plausibility" is related to the
> requirement of a Rule 8 "showing." In its general discussion, the Supreme Court
> explained that the concept of a "showing" requires only notice of a claim and its
> grounds, and distinguished such a showing from "a pleader's 'bare averment that he
> wants relief and is entitled to it.'" Twombly, 127 S.Ct. at 1965 n. 3. While Rule
> 12(b)(6) does not permit dismissal of a well-pleaded complaint simply because "it
> strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual
> allegations must be enough to raise a right to relief above the speculative level."
> The Supreme Court's Twombly formulation of the pleading standard can be summed
> up thus: "'stating ... a claim requires a complaint with enough factual matter (taken
> as true) to suggest' the required element... This 'does not impose a probability
> requirement at the pleading stage,' but instead 'simply calls for enough facts to raise
> a reasonable expectation that discovery will reveal evidence of' the necessary
> element."

Phillips v. County of Allegheny, No. 06-2869,  2008 WL 305025, * 6 (3d Cir. Feb. 5,

2008)(quoting Twombly, 127 S. Ct. at 1965)).

It is clear that the Twombly decision did not affect the well-settled standard that in considering a Rule 12(b)(6) motion, the reviewing court must accept all of the factual allegations contained within the complaint as true.  See U.S. v. Gaubert, 499 U.S. 315, 327  (1991).  In addition, all reasonable inferences should be drawn in favor of the plaintiff. See Gary v. Air Group, Inc., 397 F.3d 183, 186 (3d Cir. 2005).  Thus, in light of Twombly a "court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the nonmovant, plaintiff has alleged "enough facts to state a claim for relief that is plausible on its face."  See Stillings v. Correctional Medical Services, Inc., No. 06-4888 (RMB) 2007 WL 2123669, at *3 (D.N.J. July 20, 2007)(quoting Twombly, 127 S.Ct. at 1974).  "A pleading's factual allegations are thus evaluated for sufficiency under a 'plausibility standard.'  Motino v. Toys "R" US, Inc., No. 06-370 (SRC), 2007 WL 2123698 at *1 (D.N.J. July 19, 2007)(citing Twombly, 127 S.Ct. at 1968).  "This standard 'calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' that the pleader is entitled to relief."  Id. (citing Twombly, 127 S.Ct at 1965).  The burden of demonstrating that dismissal is appropriate still rests on the movant.  See In re Intel Corp. Microprocessor Antitrust Litigation, 496 F.Supp. 2d 404,408 (D.Del. 2007).

The Rule 12(b)(6) motion to dismiss is very limited in terms of what may be considered from an evidentiary standpoint. Specifically, the language of Rule 12(b) provides:

> If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

58

Given this narrow scope, a court hearing a Rule 12(b)(6) motion will "generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record, and documents that form the basis of a claim" <u>See</u> <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 222 n. 3 (3d Cir. 2004), *cert. denied*, 543 U.S. 918(2004) (citing <u>In re Burlington Coat Factory Sec. Litig.</u>, 114 F.3d 1410, 1426 (3d Cir. 1997); <u>Pension Ben. Guar. Corp. v. White Consol. Indus.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).  A document forms the basis of a claim when it is "integral to or explicitly relied upon in the complaint" and such a document "may be considered without converting the motion to dismiss into one for summary judgment." <u>In re Burlington Coat Factory</u>, 114 F.3d at 1426.  Against that backdrop, the Court will review defendants' arguments.

## A.     Nortel's Motion to Dismiss

The Nortel defendants argue that the motion to dismiss should be granted because the amended complaint fails to properly plead the element of duty as to all three counts.  Absent a legal duty, Nortel argues that there is no tort, no violation of the NJCFA nor equitable claims.  Therefore, this Court must determine whether Nortel maintained a duty to the Plaintiff and the putative class members.

In general, "duty, in any given situation, is predicated on the relationship existing between the parties at the relevant time; and necessarily requires some degree of knowledge." <u>Morena v. South Hills Health System</u>, 501 Pa. 634, 642, 462 A.2d 680 (1983).  The three types of relationships which may give rise to a duty to disclose are as follows: (1) fiduciary relationships, (2) relationships wherein trust and confidence is necessarily implied and (3) relationships arising out of contracts or transactions which are intrinsically fiduciary.  <u>Berman v. Gurwicz</u>, 189 N.J.Super. 89, 93-94, 458 A.2d 1311 (Ch. Div. 1981), *cert. denied*, 94 N.J. 549 (1983).  Considering the asserted lack of

relationship between Nortel and the Plaintiff, it is argued that no duty in tort arose between the parties.

The Plaintiff, however, asserts that a duty to disclose arose by the plain language of the NJCFA, to wit, pursuant to the NJCFA, a statutory duty arises to refrain from unconscionable business practices and deception, and to disclose material facts in connection with the sale or advertising of any merchandise. Nortel rejects this theory for imposing duty on the grounds that it did not participate in the distribution of any promotional materials that bore its trademark and it did not manufacture, market, advertise or distribute the Matrix box.

The Plaintiff further asserts that Nortel maintained a duty to the Plaintiff and other putative class members because its name and "globemark" logo were  featured on NorVergence's promotional materials and induced Plaintiff to enter the ERAs.  Although both parties agree that a licensor of a trademark has a duty to supervise a licensee's use of the licensor's own mark, the parties disagree as to whether such duty was invoked in the instant matter.  See In re Mini Maid Services Co. v. Maid Brigade Systems, Inc., 967 F.2d 1516, 1519 (11th Cir. 1992); Ron Matusalem & Matusa of Florida v. Ron Matusalem, Inc., 872 F.2d 1547, 1551 (11th Cir. 1989)("It is clear that a trademark owner has a duty to exercise control and supervision over the licensee's use of the mark"); Sheila's Shine Products, Inc. v. Sheila Shine, Inc., 486 F.2d 114, 123-24 (5th Cir. 1973).

It is Nortel's contention that the underlying purpose of the "duty" associated with the use of a trademark is to ensure the integrity of a registered trademark.  Nortel posits that such a duty was not intended to be broadly construed so as to afford protection to the public at large from the acts of a licensee's misuse of the mark.  Mot. to Dismiss Hr'g Tr. at 12-15, September 13, 2006.  Nortel cites the Eleventh Circuit decision in Mini Maid, in which the court found that the duty arising from

60

the use of a trademark emanates from the Lanham Act's  abandonment provisions which provide

that "a registrant's mark may be canceled if the registrant fails to control its licensees' use of the

licensed mark." 967 F.2d at 1519.  The <u>Mini Maid</u> Court explained the following:

> This duty to supervise a trademark licensee exists to protect the public from being
> misled about the quality or consistency of the products offered under the licensor's
> trademark.  By requiring a licensor to supervise a licensee's use of its own mark and
> to some extent a licensee's operations under that mark, the law attempts to ensure
> that the public will not be deceived when purchasing goods and services that relate
> to that trademark.

<u>Id.</u>   The <u>Mini Maid</u> court found that a  licensor's duty " to control a licensee's use of the

licensor's own trademark cannot be blindly converted into a duty to prevent a licensee's misuse

of another party's trademark." <u>Mini Maid</u>, 967 F.2d at 1520.  Nortel cites <u>Burkert v. Petrol Plus</u>

<u>of Naugatuck, Inc.</u>, 216 Conn. 65, 76, 579 A.2d 26 (Conn. 1990), among other cases, for the

proposition that "the sole consequence of a trademark owner's failure to exercise control over its

licensees is the potential loss of the rights associated with the trademark" and that the case law

does not show that "a trademark owner's failure to exercise control subjects the owner to

affirmative liability in tort for damages caused by a defective product bearing its trademark."  <u>Id</u>.

Moreover, a standard trademark agreement "does not, in and of itself, create an affirmative duty

to inspect which could result in a tort liability to third persons." <u>In re Silicone Gel Breast</u>

<u>Implants Products Liab. Litig.</u>, 887 F.Supp. 1455, 1461(N.D. Ala. 1995).  As further stated in <u>In</u>

<u>re TMJ Implants Prods. Liab. Litig.</u>, entering a trademark licensing agreement, "does not mean

however that, if those companies fail to police their trademarks, the law then imposes upon them

liability in tort for products that the companies neither manufactured nor sold.  Without proof of

a greater undertaking by the trademark owner, no duty to third parties arises out of the trademark

licensing agreements." 880 F.Supp. 1311, 1321 (D.Minn. 1995).

Nortel has also relied on another case that bears discussion  - the Seventh Circuit Court of

Appeals decision in <u>Oberlin v. Marlin American Corp.</u>, 596 F.2d 1322 (7th Cir. 1979).  Mot. to

Dismiss Hr'g Tr. at 15-17.   <u>Oberlin</u> involved an unsuccessful venture to market a product called

an "Attache Phone" that was to fit in an attache case and run on the same airwaves that were

"available to fixed telephone installations in vehicles."  <u>Id</u>. at 132.  The manufacturer, Melabs,

Inc., entered into an agreement with Marlin American Corp. which provided that Marlin would

exclusively market the phone in most states.  Marlin was responsible for establishing a sales and

marketing program which included development and oversight of "all brochures, sales aids,

forms, advertising materials, mats, franchise presentations, etc., necessary in the sale of the

product, both from the standpoint of the franchise sales as well as point of purchase or end user

sales."  <u>Id</u>. at 1324.   The plaintiff, Mr. Oberlin, responded to the marketing effort in June of

1969 by attending a meeting and slide presentation set up by Marlin.  Thereafter, Mr. Oberlin

paid $28,000 to Marlin and signed a contract for the purpose of becoming a "zone distributor of

Attache Phones for central Indiana."  <u>Id</u>. at 1325.    Unfortunately, Mr. Oberlin discovered by

November of 1969 that "Indiana Bell Telephone Company had no numbers available for [the]

telephones and that sale of them without numbers was difficult, if not impossible, despite [Mr.

Oberlin's] vigorous efforts."  <u>Id</u>.  So Mr. Oberlin filed a diversity action against various

defendants including the manufacturer and its parent company which suit was continued by Mr.

Oberlin's wife after he passed away.   The district court directed verdict in favor of defendants

and plaintiff appealed.   Plaintiff argued on appeal that  federal trademark law imposed a duty on

the parent company of the manufacturer to supervise the operations of the marketing company

Marlin, thereby creating an agency relationship.  In affirming the district court's decision to

direct the verdict in favor of defendants, the Seventh Circuit Court of Appeals found the

following, among other things:

> The purpose of the Lanham Act, however, is to ensure the integrity of registered
> trademarks, not to create a federal law of agency. Furthermore, the scope of the duty
> of supervision associated with a registered trademark is commensurate with this
> narrow purpose. The duty does not give a licensor control over the day-to-day
> operations of a licensee beyond that necessary to ensure uniform quality of the
> product or service in question. It does not automatically saddle the licensor with the
> responsibilities under state law of a principal for his agent.

Id. at 1327.

The Oberlin court further stated that it had "already considered the evidence of control

exercised by [the parent company of the manufacturer] and [the manufacturer] over Marlin and

have found it insufficient to create a jury question as to the existence of an agency relationship."

Id.    This Court notes that the procedural posture of Oberlin is distinct from the matter *sub*

*judice* since the Oberlin matter was at the point of trial, presumably with discovery complete.

Thus, the trial and appellate courts had the benefit of all the available evidence to assess the

parties' relationship.

Plaintiff herein argues that the Mini Maid decision discussed above actually supports its

contention that, in limited instances, liability may be imposed on manufacturers or distributors

for the misuse of a trademark.  See Mini Maid, 967 F.2d at 1521; Inwood Laboratories, Inc. v.

Ives Laboratories, Inc., 456 U.S. 844, 853-54 (1982).  When parties intentionally induce

"another to infringe a trademark" or if a manufacturer or distributor "continues to supply its

product to one whom it knows or has reason to know is engaging in trademark infringement,"

then such parties may be "contributorially [sic] responsible for any harm done as a result of the

deceit."  Id.  Liability for contributory infringement will depend on whether the contributing

party "intended to participate in the infringement or actually knew about the infringing

activities." Id.; Kealoha v. E.I. DuPont DeNemours and Co., 82 F.3d 894, 903 (9th Cir. 1996)

("[C]ourts have only imposed such [vicarious] liability when the trademark holder either

voluntarily licensed its trademark or had significant involvement in the design, manufacture, or

distribution of the other companies' product.")  Moreover, "if there is a sufficient relationship

between the licensor and the end product, the licensor may be held liable because the licensor

'put out' the product as its own." O. Jackson v. Coldspring Terrace Prop. Owners Assoc., 939

S.W.2d 762, 767 (Tex.1997) .  Since Nortel entered a Purchase and License Agreement with

NorVergence and it is asserted by Plaintiff that Nortel knowingly "permitted NorVergence to use

the mark in a manner that was deceptive to consumers," Plaintiff argues that under Kealoha and

Mini Maid, Nortel owed a duty to the Plaintiff and the consuming public.

This Court will address the issue of whether Nortel maintained a legal duty to disclose

information to Plaintiff and other putative class members.  While a trademark owner does

maintain a duty to police the use of its trademark to prevent loss of such mark, courts have also

imposed liability where a party intentionally induces another to infringe upon a mark or

knowingly participate in the fraudulent scheme.  At the motion to dismiss stage, this Court must

draw all reasonable inferences in favor of the non-moving party.  Drawing all reasonable

inferences in favor of Plaintiff, this Court must accept for the purposes of this motion that Nortel

engineers collaborated with NorVergence to develop and market the Matrix box, and by entering

into the PLA, the Nortel defendants engaged in an undertaking  as to arguably impose an

affirmative duty to third parties under the trademark licensing agreement.  See Amended

Complaint, ¶ 16.  Moreover, this Court finds a sufficient relationship between Nortel and

NorVergence's end product, the Matrix box.  At this stage, dismissal of the amended complaint

on the grounds that no duty to the Plaintiff and other putative class members is premature.

Accepting for the purposes of this instant motion that Nortel maintained a duty to

disclose to the Plaintiff, the Court shall determine whether dismissal is warranted as to the

specific counts set forth in the amended complaint.

### *Count I- Violation of the New Jersey Consumer Fraud Act*

As noted previously, Nortel contends that it did not owe a legal duty to Plaintiff.  Nortel

further contends that the complaint fails to allege a violation of the NJCFA.  Next, Nortel asserts

that the complaint fails to establish the necessary connection or contact between the parties.

Nortel further argues that the complaint fails to allege material misrepresentations or material

omissions by Nortel to proceed under NJCFA and that causation is not adequately plead.

The New Jersey Consumer Fraud Act (the "NJCFA") provides, in relevant part:

> The act, use or employment by any person of any unconscionable commercial
> practice, deception, fraud, false pretense, false promise, misrepresentation, or the
> knowing, concealment, suppression, or omission of any material fact with intent
> that others rely upon such concealment, suppression or omission, in connection
> with the sale or advertisement of any merchandise or real estate, or with the
> subsequent performance of such person as aforesaid, whether or not any person
> has in fact been misled, deceived or damaged thereby, is declared to be an
> unlawful practice....

N.J.S.A. 56:8-2.

To prevail under the NJCFA, the plaintiff must establish a violation of the act, that the

plaintiff suffered an ascertainable loss as a result of the unlawful conduct and a casual

connection between the unlawful conduct and the loss sustained by the plaintiff.  Szczubelek v.

Cendant Mortgage Corp., 215 F.R.D. 107, 126 (D.N.J. 2003); Weinberg v. Sprint Corp., 173 N.J.

233, 801 A.2d 281 (2002).  Courts have recognized three categories of unlawful conduct which

65

violate the NJCFA.  Szczubelek, 215 F.R.D. at 125.  "The first category (unconscionable commercial practice, deception, fraud, false pretense, false promise or misrepresentation) consists of *affirmative* acts, and the second category (concealment, suppression or omission of any material fact) consists of *acts of omission*."  Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 598, 581 A.2d 91 (App. Div. 1990), *aff'd*, 124 N.J. 520 (1991).  The third category of unlawful practice is based on violation of State regulations.  Szczubelek, 215 F.R.D. at 125; Cox v. Sears Roebuck & Co., 138 N.J. 2, 18, 647 A.2d 454 (N.J. 1994).

The text of the statute and applicable case law indicate that wrongful conduct outlined in the NJCFA is to be read disjunctively.  State v. Hudson Furniture Co., 165 N.J.Super. 516, 520, 398 A.2d 900 (App. Div. 1979).  Thus, a defendant may be liable under the NJCFA as a result of engaging in an "unconscionable commercial practice," without also engaging in an act of fraud.  Id. When the alleged consumer fraud violation consists of an affirmative act as opposed to an omission, plaintiff need not prove that the plaintiff intended to commit an unlawful act. Cox v. Sears Roebuck & Co., 138 N.J. at 17("When the alleged consumer-fraud violation consists of an affirmative act, intent is not an essential element and the plaintiff need not prove that the defendant intended to commit an unlawful act"); Chattin, 243 NJ Super. at 598 ("[T]hose kinds of consumer fraud consisting of affirmative acts do not require a showing of "intent": The capacity to mislead is the primary ingredient of deception or an unconscionable commercial practice.  Intent is not an essential element.")  If, however, the claim rests on an omission, "the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud."  Cox, 138 NJ at 18 (citing Chattin, 124 NJ at 522 (Stein, J. concurring)).  Further, in the event that a plaintiff's claim under the

NJCFA rests on fraud, the heightened pleading requirement of Rule 9(b) is fully applicable. See F.D.I.C. v. Bathgate, 27 F.3d 850, 876 (3d Cir.1994).

Although Nortel recognizes that courts have not specifically required privity between parties to find a violation of the NJCFA, Nortel argues that courts have required some direct or indirect contact between the parties. Since Nortel did not maintain any relationship with the Plaintiff or the putative class members, it argues that Count I of the amended complaint should be dismissed. Analogizing the facts to Peters v. United States Dep't. of Hous. & Urban Dev., No. 04:06057(RBK), 2006 WL 278916 (D.N.J. February 1, 2006) which is discussed below, Nortel argues that without a relationship between itself and Plaintiff, granting the motion to dismiss is proper.

In Peters, the purchaser of a HUD home learned that the home was infested with termites and brought NJCFA claims against the company that had managed the property for HUD. The Peters Court asserted that since "there appears to have been no contact whatsoever between Plaintiffs and [Defendant] it would seem difficult for Plaintiff to assert that [Defendant] knowingly and intentionally concealed or omitted anything. If there has been no contact or relationship between Plaintiffs and [Defendant], there would be no opportunity for misrepresentation or omission." Id. at *6. Reading the Peters decision, the Plaintiff asserts that the court's comments on contact between the parties were solely dictum as the Court had already determined that the claims should be dismissed for failing to allege that the defendant management company was aware of the termite condition at issue in that case or intended plaintiff to rely on such omission. Plaintiff argues that its amended complaint outlines the extent of Nortel's knowledge and intent therefore its claims should not be defeated by the speculative dictum of the Peters Court.

Plaintiff further distinguishes the case of  Judge v. Blackfin Yacht Corp., 357 N.J. Super. 418,  815 A.2d 537 (App. Div. 2003) *cert. denied* 176 N.J. 428, 824 A.2d 157 (N.J.  2003) which involved consumer fraud claims brought by the purchaser of a motor boat against, among others, the retail seller of the boat.  The plaintiff in Judge alleged that the defendant violated the New Jersey Consumer Fraud Act through both affirmative actions and acts of omission.   The alleged acts of omission consisted of 1) defendant's failure to advise plaintiff that the boat manufacturer was in bankruptcy and 2) defendant's failure to notify plaintiff before the boat was delivered that another company had acquired the boat manufacturer's assets.  The New Jersey Superior Court, Appellate Division vacated both the trial court's denial of defendant's motion for judgment notwithstanding verdict and its grant of defendant's motion for a new trial and found instead that the defendant was entitled to judgement in its favor not withstanding the verdict.

Of relevance to the present matter, the defendant in Judge, similar to the defendants herein, argued that it lacked a duty to disclose.  Specifically the Judge defendant argued that "as a retailer, it had no duty to disclose the financial status of a manufacturer/supplier to a customer." Id. at 426-27.  The  court found however that "[d]uty is a question of law" and "[w]hether a duty existed must be determined in light of the factual circumstances." Id. at 427.  The court further stated that under the circumstances before it, given the non-refundable deposit required by defendant for the made-to-order boat, " if defendant knew that Blackfin's bankruptcy would affect its ability to produce the boat, defendant clearly had a duty disclose." Id.  The Court reviewed the evidence before it , which included plaintiff's own testimony that he spoke with the boat manufacturer's owner regarding the bankruptcy, and found that the plaintiff had not presented any evidence that business was not being conducted as usual or that the boat would not be delivered as ordered.  Thus, the court found  that

there was no duty on the part of the defendant to disclose the bankruptcy to plaintiff before he signed the contract "because there was no foreseeable risk that Blackfin would not deliver the boat." Id.

Plaintiff distinguishes Judge on the grounds that the court's analysis in that case did not focus on the contact of the parties to determine whether the NJCFA was violated. On the contrary, Plaintiff argues that the Judge case bolsters its position by reinforcing the proposition that the NJCFA requires the disclosure of material information in connection with the sale or advertising of merchandise. As stated earlier, the Judge Court concluded "if defendant knew that [the manufacturer's] bankruptcy would affect its ability to produce the boat, defendant clearly had a duty to disclose it." Id. at 427.

Next, the Nortel defendants argue that the amended complaint does not set forth an affirmative misrepresentation, material or otherwise, or an act of omission as required to prevail on a NJCFA claim. Since the amended complaint does not allege that Nortel made affirmative misrepresentations to the Plaintiff, Nortel argues that the Plaintiff is electing to proceed under an act of omission. To establish an act of omission under the NJCFA, "plaintiff must show that defendant (1) knowingly concealed (2) a material fact (3) with the intention that plaintiff rely upon the concealment." Judge v. Blackfin Yacht Corp., 357 N.J. Super. at 425; See also, Leon v. Rite Aid Corp., 340 NJ Super. 462, 774 A.2d 674 (App. Div. 2001). Nortel contends that the amended complaint alleges that both NorVergence and Nortel omitted to disclose the purportedly minimal value of the Matrix box but a "mere opinion" as to value is not the type of fact that requires disclosure. Amended Complaint ¶ 37; Nortel Br. at p. 11 (citing Rodio v. Smith, 123 NJ 345, 352 (1991)(finding that the slogan "You're in good hands with Allstate" was "not a statement of fact" and could not "rise to the level of common law fraud" but was instead "nothing more than puffery"

and did not fall within the ambit of the NJCFA.).  Further, regarding Plaintiff's allegation that Nortel

improperly omitted to disclose NorVergence's intent to assign the Matrix box leases to a third-party

after the lease had been executed, Nortel claims  that it had no duty to  anticipate future events and

Plaintiff has not alleged that Nortel knew of the future plans.  Id.

Plaintiff argues that Nortel is incorrect in its assertion that the amended complaint alleged

only omissions by Nortel.  Rather, Plaintiff emphasizes that "not only did Nortel fail to disclose

material information, such as the fact that the Matrix boxes did not do what the brochures with

Nortel's logo said they did" but Nortel also engaged in unconscionable commercial practice by

"knowingly permitting the use of its logo" in relation to " false and misleading statements" which

resulted in "an unconscionable commercial practice."  Pl. Resp. to Nortel at p. 12.  Plaintiff

maintains that the sale of goods or services at a price that greatly exceeds their value falls under the

purview of the NJCFA and Nortel violated the NJCFA by failing to disclose the material facts

regarding the true value of the Matrix box. Id. at 12-13.  In addition, Plaintiff has alleged that Nortel

" participated in a scheme which involved assignment of the "leases" in an attempt to force payment

after service was disconnected". Id. at 12-13.

Nortel also argues that the amended complaint fails to allege an ascertainable loss which

resulted from the unlawful conduct recognized in the NJCFA.  Regardless of whether plaintiff

alleges an affirmative act or an act of omission, plaintiff may be entitled to damages under NJCFA

upon demonstrating "a causal relationship between the unlawful fraud and his loss."  Id.; See

Feinberg v. Red Bank Volvo, 331 NJ Super. 506,511, 752 A.2d 720,723 (App. Div. 2000); Talalai

v. Cooper Tire & Rubber Co., 360 NJ Super. 547, 562, 823 A.2d 888 (Law Div. 2001)("In order to

prevail under [NJCFA] a plaintiff must prove both a violation of the Act as well as an 'ascertainable

loss . . . as a result of the unlawful conduct.'") It is Nortel's position that there is no link between

its action and the loss suffered by the Plaintiff.   In contrast, Plaintiff argues that the licensed use of

Nortel's name and logo in connection with NorVergence's promotional materials is a sufficient

connection between Nortel's role in NorVergence's fraudulent scheme and the losses sustained by

the Plaintiff and the putative class.  As well, Plaintiff argues that even if it had not alleged causation,

Plaintiff can proceed with its case under the NJCFA and recover attorneys fees and costs if it can

prove Defendant committed an unlawful practice, even if the victim cannot show any ascertainable

loss and cannot recover treble damages. Cox. v. Sears Roebuck & Co., 138 N.J. 2, 16, 24, 647 A.2d

454 (1994).

To prevail on an act of omission in violation of the NJCFA as set forth in Count I, Plaintiff

must demonstrate that Nortel knowingly concealed a material fact with the intention that plaintiff

rely upon the concealment.   See Judge v. Blackfin Yacht Corp., 357 NJ Super. 418, 424-25, 815

A.2d 537 (App. Div.  2003), cert. denied 176 N.J. 428, 824 A.2d 157 (2003).   Accepting that the

true value of the Matrix box and NorVergence's intention to assign the Matrix box are material

facts, Plaintiff must still demonstrate that Nortel knowingly concealed such information with the

intention that the Plaintiff and other class members would rely upon the concealment.  However, the

Court is satisfied that the Plaintiff's complaint pleads with sufficient particularity to move Count I

of the complaint regarding affirmative acts and acts of omission "across the line from conceivable

to plausible." Twombly, 127 S. Ct. at 1974.   The parties dispute the scope of Nortel's knowledge

with respect to NorVergence's fraudulent scheme.  Considering Nortel's alleged collaboration in

development of the Matrix box, further discovery is necessary to ascertain the extent of such

knowledge.  Accordingly, dismissal of Count I as to Nortel, the claim pursuant to the NJCFA is premature at this stage.

***Count II-Negligent Misrepresentation***

Nortel argues that dismissal of Count II of the amended complaint sounding in negligent misrepresentation is proper as a matter of law.  Nortel specifically asserts that it did not owe a duty to the Plaintiff, that the amended complaint does not allege any material misrepresentations or omissions by Nortel and that the complaint does not allege that any act or omission by Nortel was the cause of any loss.  Plaintiff's response states that the elements of negligent misrepresentation were properly plead.

To sustain a cause of action based on negligent misrepresentation under New Jersey law, the plaintiff must demonstrate that "1) the defendant negligently provided false information; 2) the plaintiff was a reasonably foreseeable recipient of that information; 3) the plaintiff justifiably relied on the information; and 4) the false statements were a proximate cause of the plaintiff's damages." McCall v. Metropolitan Life Insurance, 956 F.Supp. 1172, 1186 (D.N.J. 1996); Masone v. Levine, 382 N.J. Super. 181, 187, 887 A.2d 1191 (App. Div. 2005)(Plaintiff must "establish that the defendant negligently made an incorrect statement of a past or existing fact, that the plaintiff justifiably relied on it and that his reliance caused a loss or injury."); H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334, 461 A.2d 138 (1983)("An incorrect statement negligently made and justifiably relied upon, may be the basis for recovery of damages for economic loss or injury sustained as a consequence of that reliance.")

In Highlands Insurance Company v. Hobbs Group, 373 F.3d 347, 351 (3d Cir. 2004), the Third Circuit noted that "under New Jersey law negligent misrepresentation requires a showing that

defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance on that information.  In that respect a defendant may be liable (because it owes a duty) to any foreseeable recipient who relies on the information."  See Karu v. Feldman, 119 N.J. 135, 148, 574 A.2d 420 (1990)("In other contexts, courts have recognized a cause of action based on negligent misrepresentation when a party fails to provide the correct information at the time when it might affect future actions, where there is a duty to disclose.") The Third Circuit acknowledged that an action for negligent misrepresentation under New Jersey law also may be "based on the defendant's silence or suppression of the truth rather than on some affirmative misrepresentation" and in such instance "is not limited to special relationships such as those involving transactions with explicit fiduciary duties, transactions where a quasifiduciary relationship develops either through the express conduct of the parties or other circumstances particular to that individual transaction or transactions . . .  whose nature inherently requires such a duty regardless of the parties' intentions." Highlands, 373 F.3d at 355 (citing Strawn v. Canuso, 140 NJ 43, 657 A.2d 420, 429 (N.J. 1995) *superseded by statute on other grounds*, L. 1995, c. 253 (codified at N.J.S.A. 46:3C-10)).

The Third Circuit Court of Appeals further explained that under New Jersey state law "the required duty of disclosure may also arise in any situation called for by good faith and common decency." Id. at 355 (citing  Maertin v. Armstrong World Indus., Inc., 241 F.Supp. 2d 434, 461 (D.N.J. 2002) which conformed to the holding of City Check Cashing, Inc.  v. Manufacturers Hanover Trust Co., 166 NJ 49, 60-61, 764 A.2d 411, 417 (N.J. 2001)).

Nortel reiterates its position that it did not owe the Plaintiff or the putative class any legally recognized duty to protect the public against NorVergence's alleged bad acts, and without such duty, there is no tort liability.  Nortel contends that the amended complaint merely establishes a commercial relationship between the parties.  Nortel further argues that the

73

amended complaint fails to identify an act or omission that constitutes a misrepresentation and no casual link is established between Nortel and the losses suffered by the Plaintiff.

The question of whether dismissal of the negligent misrepresentation count against Nortel is warranted  turns on the following analysis.  As discussed above, for purposes of the instant motion, this Court has found that Nortel did maintain a duty to disclose to the Plaintiff.  In addition, the Plaintiff has alleged that the Plaintiff and members of the putative class viewed false and misleading promotional materials concerning the Matrix box, that these promotional materials contained the Nortel name and logo and further that the presence of the trusted Nortel name on these false and misleading promotional materials induced Plaintiff and the class members to sign Matrix box leases.  Accepting the allegations contained in the amended complaint as true, it is plausible that but for the presence of the Nortel name and logo on the alleged false and misleading materials that Plaintiff and the class members would not have signed the Matrix box leases thereby making it possible for Plaintiff to satisfy the casual link element of negligent misrepresentation.  However, the Plaintiff must still establish that Nortel negligently provided false information by some act or omission.  Under New Jersey law, it is possible for a cause of action for negligent misrepresentation to be based on a defendant's silence or suppression of the truth rather than an affirmative misrepresentation.  <u>Highlands Insurance Co.</u>, 373 F.3d at 355.   However, in order to determine whether Nortel was silent or otherwise suppressed the truth it is necessary to have a fuller understanding of what Nortel knew about NorVergence's fraudulent scheme.  Here the parties dispute the extent of Nortel's knowledge of NorVergence's fraudulent scheme.   Thus, further discovery is required on the issue of Nortel's knowledge and dismissal of Count II of the amended adversary complaint is premature.  However, the Court is satisfied that as to Nortel, Count II of the Plaintiff's Complaint states a claim for relief that is "plausible on its face" and not merely a

"formulaic recitation of the elements of a cause of action."  See Twombly, 127 S.Ct. at 1960, and

1964-65.  Accordingly, dismissal of Count II as to Nortel, the claim of negligent misrepresentation,

is denied at this time.

### Count III – Unjust Enrichment

Nortel argues that dismissal of Count III of the amended complaint is required as a matter

of law because the Plaintiff has not alleged a relationship with Nortel of the sort required to invoke

this state's equitable remedies and that the amended complaint fails to establish that Nortel unjustly

received anything from the Plaintiff.  Nortel further argues that the Plaintiff has failed to allege that

it expected renumeration from Nortel as required to maintain a cause of action for unjust enrichment.

See VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519, 526 (1994) (holding that

the unjust enrichment doctrine requires that the Plaintiff show it expected renumeration from the

defendant at the time it performed or conferred a benefit on the defendant and that the failure of

remuneration enriched defendant beyond its contractual rights); Callano v. Oakwood Park Homes

Corp., 91 N.J. Super 105, 219 A.2d 332 (App. Div. 1966) (holding that liability for unjust

enrichment has been successfully asserted where the plaintiff expected renumeration from the

defendant, or if the true facts were known to the plaintiff, he would have expected renumeration, at

the time the benefit was conferred); Associates Commercial Corp. v. Wallia, 211 N.J. Super 231,

244, 511 A.2d 709 (App. Div. 1986).

The Plaintiff has argued to the contrary that under New Jersey law a claim for unjust

enrichment may be maintained even if the Plaintiff did not expect renumeration from Nortel.

Plaintiff argues that while quasi-contractual theories of unjust enrichment are common, unjust

enrichment claims can be sustained in connection with consumer fraud claims where the facts at

issue do not involve any expectation of remuneration or other quasi-contractual elements.  New

York Career Guidance Serv. Inc. v. Wells Fargo Fin. Leasing, No. BER-L-1705-03, 2005 WL
1252315 *6 (N.J. Super. Ct., Law Div. May 2, 2005).  It is not necessary to find for purposes of this
motion that Plaintiff expected renumeration at the time Plaintiff conferred a benefit to Nortel.
Rather, it is enough to find that the Plaintiff would have expected renumeration if the Plaintiff knew
the true facts at the time the Plaintiff allegedly conferred a benefit to Nortel.

Here, Plaintiff has alleged that the Plaintiff and members of the putative class signed Matrix
box leases for significantly overvalued equipment that could not function as promised.  It is further
alleged that Nortel benefitted financially from the Plaintiff and the class members entering into
Matrix box leases.  Thus, accepting the allegations as true for purposes of the instant motion, it is
plausible that if the Plaintiff and the putative class members had known the truth about the Matrix
box when they entered the equipment lease, then they would have expected renumeration from
Nortel who arguably benefitted from the overpriced Matrix box.  As such, the Plaintiff has asserted
a plausible claim of unjust enrichment against Nortel and accordingly the Court shall deny Nortel's
motion to dismiss Count III of the adversary complaint for failure to state a claim upon which relief
may be granted.

Whenever a plaintiff makes an allegation of fraud, the heightened pleading requirements of
Federal Rule of Civil Procedure 9(b), made applicable here pursuant to Bankruptcy Rule of
Procedure 7009, must be met in order to survive a 12(b)(6) motion to dismiss.  Rule 9(b) states: "In
all averments of fraud or mistake, the circumstances constituting fraud  or mistake shall be stated
with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be
averred generally."  See Fed. R. Civ. P. 9(b).  The purpose of the heightened pleading requirement
of Rule 9(b) "is to provide notice, not to test the factual allegations of the claim."  Morganroth &
Morganroth v. Norris, McLaughlin & Marcus, P.C., 331 F.3d 406, 414 n.2 (3d Cir. 2003)(citing

Gutman v. Howard Savings Bank, 748 F.Supp. 254, 257 (D.N.J.1990)). A plaintiff satisfies Rule 9(b) when they "plead with particularity the circumstances of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." Lum v. Bank of America, 361 F.3d 217, 223-24 (3d. Cir. 2004), *cert. denied*, 543 U.S. 918 (2004) (citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir.1984), *cert. denied*, 469 U.S. 1211 (1985)).  Generally, plaintiffs must "support their allegations of ... fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story ... the "who, what, when, where and how" of the events at issue." In re Rockefeller Center Properties, Inc. Securities Litigation, 311 F.3d 198, 217 (3d Cir. 2002) (citations omitted). However, a plaintiff may still satisfy Rule 9(b) by using some other "means of injecting precision and some measure of substantiation into their allegations of fraud." Lum, 361 F.3d at 224 (quoting Seville Indus., 742 F.2d at 791).  Ultimately, the Rule 9(b) specificity requirement exists so that defendants are capable of preparing a defense to the specific allegations of fraud with which they are presented. See Rolo v. City Investing Company Liquidating Trust, 155 F.3d 644, 659 (3d Cir. 1998).  Therefore, in cases involving multiple plaintiffs that are not certified as class actions, the specificity requirement must be met with respect to each individual plaintiff.  Id.  Similarly, fraud allegations made against multiple defendants must clearly distinguish the allegedly fraudulent conduct in which each defendant engaged. See Poling v. K. Hovnanian Enterprises, 99 F.Supp.2d 502, 508 (D.N.J. 2000), *appeal dismissed*, 32 Fed. Appx. 32 (3d Cir. 2002)("[A]llegations that generally allege fraud as against multiple defendants, without informing each defendant as to the specific fraudulent acts he or she is alleged to have committed do not satisfy Rule 9(b).").

The Court must address the sufficiency of the Amended Complaint and whether it has been pled in compliance with Rule 9(b) with respect to the fraud allegations.    Nortel has asserted that the only "specific" allegations of fraud contained in the Amended Complaint pertain to NorVergence and otherwise the Amended Complaint makes "generic references to the alleged acts of "Defendants". Nortel Br. at 19.   Nortel claims that the Amended Complaint fails "to identify who committed what alleged fraud, when such alleged fraud occurred, or how any alleged conduct amounted to fraud." Id.  Nortel emphasizes that the Amended Complaint does not contain allegations that Nortel either  played any role in the negotiation with Plaintiff or even knew of such negotiation or that Nortel was "responsible for or had within its control deceptive information" that was affirmatively conveyed to plaintiff through the equipment leases NorVergence presented to Plaintiff. Id.  Nortel further contends that the claims have been "insufficiently pleaded to put Nortel on notice of the specific nature of a single charge against them" and that it is evident that further amendment to the complaint would be futile.  Id. at 20 (citing Anderson v. Ayling, 396 F.3d 265, 271 (3d Cir. 2005)).

However, as plaintiff has argued in its response to Nortel's motion, Plaintiff has identified the parties in the Complaint ¶¶ 8-14[5], provided a detailed account of the alleged fraudulent scheme in ¶¶24-46, described Nortel's participation in the scheme in ¶¶16, 20, 27, 32[6] and identified certain

---

[5]In Paragraphs 8- 14 of the Amended Complaint the  Plaintiff Wanland is identified in addition to  the following Defendants: Nortel Networks Ltd., Nortel Networks Inc., Qwest Communications International Inc., Thomas N. Salzano, Alexander L. Wolf and Robert J. Fine.

[6] In Paragraph 16 of the Amended Complaint it is stated that: "Nortel formed a co-marketing partnership with NorVergence soon after NorVergence was founded.. Nortel engineers collaborated with NorVergence in the development and marketing of MATRIX ™ technology, which technology purportedly was used in a piece of equipment generally referred to as a "Matrix box" or, depending upon the model, a "Matrix SoHo box." In Paragraph 17 it is stated that in furtherance of the partnership Nortel entered into a Purchase and Licence Agreement ("PLA") with NorVergence on September 27, 2001.  In Paragraph 18 it is asserted that the

information which Plaintiff claims should have been disclosed in ¶¶ 37, 38.[7]  See Pl. Resp. to Nortel

at 15.  The Court is satisfied that the fraud based claims against Nortel are plead with the necessary

specificity under Fed.R.Civ.P. 9(b) to withstand the current challenge.  However, to the extent

additional documents and information have become available after the Amended Complaint was

filed and Plaintiff is capable of pleading with even greater specificity, the Court directs Plaintiff to

further amend the complaint within thirty days of the date of this Opinion.

**B.      Qwest's Motion to Dismiss**

---

pursuant to the PLA "Nortel supplied products and services to NorVergence, and Nortel enrolled
NorVergence in its Services Partner Initiative Co-Marketing Program for the purpose of
"promoting joint sales of Nortel Networks/[NorVergence] solutions" by NorVergence."  In
Paragraph 19 it is set forth that "Nortel and NorVergence agreed to "work together and take the
appropriate steps" for NorVergence to make sales to "Small and Medium Enterprise In
customers." The co-marketing activities contemplated by the "Statement of Work" attached to
the Nortel/NorVergence PLA included endorsement of NorVergence by Nortel during a  national
sales "Road Show," as well as joint Nortel/NorVergence sales calls." In Paragraph 20 it is
alleged that "[t]he  PLA also incorporates trademark licensing terms and conditions.  Attachment
B to Supplement #3 to the PLA (the "Trademark License Agreement") is an agreement between
Nortel Networks Limited and NorVergence wherein Nortel Networks Limited grants
NorVergence the right to use its "Solutions by Nortel Networks" trademark, along with the logo
referred to as the
"globemark," in the United States."  In Paragraph 27 it is stated that "NorVergence assured
potential customers that they could trust NorVergence by invoking the well-known name of its
business partners, Nortel and Qwest. With the knowledge and permission of Nortel and Qwest,
NorVergence featured the Nortel and Qwest logos on full-color brochures and on many of the
forms that they presented to potential customers."  In Paragraph 32 it is alleged that "[a]s
sophisticated telecommunications providers, Nortel and Qwest knew or should have known that
the Matrix boxes could not perform the functions attributed to them in the brochures, scripts and
sales calls which prominently featured their corporate names and trademarked logos."

[7]In Paragraph 37 of the Amended Complaint, it is alleged that "NorVergence, Nortel and Qwest
failed to disclose to prospective customers that the value of the Matrix box was minimal or that
they would pay thousands or tens of thousands of dollars more than the value of the Matrix box
over the course of their leases."  In Paragraph 38 it is alleged that "NorVergence, Nortel and
Qwest failed to disclose to prospective customers that they intended to assign the Matrix box
"lease" to a third party leasing company shortly after the lease was executed, nor did
NorVergence, Nortel and Qwest disclose that the terms of the lease were intended to force
customers to continue paying even after their telecommunications services had been shut down."

In essence, as described in greater detail below, Qwest argues that this Court as a matter of law must dismiss the Plaintiff's claims against Qwest because the amended complaint fails to establish any relationship or duty owed to the Plaintiff, and further fails to allege that Qwest had knowledge of NorVergence's allegedly fraudulent scheme.  Qwest argues that dismissal is warranted because the specific allegations pertaining to it are even "thinner" than those leveled against the Nortel Defendants since unlike Nortel, former Qwest employees did not help to found NorVergence and also unlike Nortel, Qwest was not involved in helping to develop the Matrix box.

Specifically, Qwest argues that the Amended Complaint 1) fails to plead fraud with particularity contrary to Fed R. Civ. P. 9(b); 2) the Amended Complaint fails to state a claim that Qwest violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2; 3) the Amended Complaint fails to state a claim against Qwest for negligent misrepresentation; and 4) the Amended Complaint fails to state a claim  against Qwest for unjust enrichment.  Qwest submits that the amended complaint only alleges that at some unspecified date, Qwest formed a partnership with NorVergence, in which Qwest agreed to provide wholesale telecommunications services to NorVergence and to include NorVergence in its Business Partnership Program.  The amended complaint also alleges that in connection with the Business Partnership Program, Qwest permitted NorVergence to use the Qwest logo on NorVergence business brochures and business forms.  See Complaint ¶¶ 22-23.  However, the amended complaint does not allege that Qwest or Nortel made any statements directly to Wanland, nor does it allege that either Qwest or Nortel were a party to or received a direct payment from the equipment leases either in the form of monthly rentals or proceeds of the alleged assignment to a third party.  Qwest Br. at 7.

Qwest does not deny that it maintained a relationship with NorVergence. In fact, Qwest has submitted to the Court a copy of a Wholesale Services Agreement (the "2001 WSA") that Qwest Communications Corp. and NorVergence entered in 2001 to explain the nature of its relationship with NorVergence. Id. at 8-9; Carlson Decl., Ex. B. In addition, Qwest has also submitted a copy of a second WSA that Qwest Communications Corp. and NorVergence entered in 2003 (the "2003 WSA") to further explain the scope and nature of its relationship with NorVergence. Carlson Decl. Ex. C.

Qwest relies on the 2001 WSA to show that under the terms of the agreement NorVergence agreed to purchase telecommunications services from QCC and that "resale of the services to retail customers by NorVergence was at NorVergence's financial risk without liability to Qwest Communications Corp. and that NorVergence's duty to pay Qwest was not contingent on collection from its retail customers." Carlson Decl., Ex. B ¶13.2. In addition, the 2001 WSA states that neither party had the authority to bind the other and that the relationship arising from the 2001 MSA does not constitute an agency, joint venture, partnership employee relationship or franchise. Carlson Decl., Ex. B ¶10. The 2001 WSA further states that NorVergence could not use Qwest's trade name or logo without Qwest's prior consent. Carlson Decl., Ex. B ¶5.

Qwest submits that the 2003 WSA was very similar to the 2001 WSA, with the proviso that the 2003 WSA specifically prohibited NorVergence from attempting to "sell services to End Users using the name Qwest or its affiliates or Qwest IP materials, including but not limited to the Qwest and Qwest Business Partner Program Logos." Qwest Br. at 10; Carlson Decl., Ex. C ¶ 5.

To further explain its business relationship with NorVergence, Qwest has also submitted a

copy of a Master Representative Agreement ("MRA") that Qwest Services Corporation entered into with NorVergence in February 2002. Carlson Decl., Ex. D. Pursuant to the MRA, NorVergence was permitted to solicit orders from non-residential, commercial subscribers to telecommunications and multimedia services provided by Qwest. Carlson Decl., Ex. D, ¶ 1. Qwest maintains that the MRA only allowed NorVergence to solicit orders for the retail sale by Qwest of Qwest services and expressly prohibited NorVergence from using its own promotional materials in connection with such solicitation. Qwest Br. at 11. Furthermore, the MRA prohibited NorVergence from using the Qwest trademark to "imply that other goods or services marketed by NorVergence, including the Matrix box, are Qwest products or have been approved by Qwest." Id. Qwest relies heavily on the 2001 and 2003 WSAs as well as the MRA to show that although it had a business relationship with NorVergence the scope of that relationship, as evidenced by the aforementioned agreements, prohibited NorVergence from using Qwest's name and logo without permission. In light of the agreements, Qwest asserts that Wanland cannot establish that the use of the Qwest logo was approved. Qwest further asserts that NorVergence lacked the apparent authority to bind it and further that Qwest did nothing whereby Wanland would reasonably believe that NorVergence was selling Matrix boxes as an agent of Qwest.

The Court will first address whether it is proper to consider the exhibits attached to the Carlson Declaration. Plaintiff asserts that it did not have notice of the documents attached as exhibits to the Carlson Declaration. Plaintiff did not reference these documents in the Amended Complaint and only based its amended complaint on the documents available to it defining the relationship between Nortel and NorVergence. As such, Plaintiff asks this Court to not take into consideration the documents included in the Carlson Declaration. Plaintiff points to case law suggesting that only documents integral to or explicitly relied upon by the complaint should be

considered by a court in reviewing a 12(b)(6) motion to dismiss without converting the motion to

dismiss to one for summary judgment. See In re Rockerfeller Center Properties, 311 F.3d. 198, 205-

06 (3d Cir. 2002); Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

In response, Qwest contends that this Court should consider the documents contained in the

Carlson Declaration as they are authentic documents.  Qwest cites to the Third Circuit Court of

Appeals opinion in In re Donald J. Trump Casinos Sec. Litig, 7 F.3d 357, 368 n. 9 (3d Cir.

1993),*cert. denied*, Gollomp v. Trump, 510 U.S. 1178 (1994) (citing Pension Benefit Guar. Corp.

v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)) for the proposition that a court may

consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to

dismiss if the plaintiff's claims are based on the document.  Qwest Reply at 2.  Qwest further notes

that the purpose of the rule is to avoid the  situation where "a plaintiff with a legally deficient claim

that is based on a particular document can avoid dismissal of that claim by failing to attach the relied

upon document." Id. at 2-3 (citing Lum v. Bank of America, 361 F.3d 217, 222 (3d Cir. 2004)).

Here, while the Plaintiff arguably did not have the documents attached to the Carlson

Declaration when drafting the complaint, it is not improper to measure the sufficiency of the claims

in the Plaintiff's adversary complaint against the contents of the documents in the Carlson

Declaration.  These documents are integral to or explicitly relied upon in the Complaint.  Further,

considering the documents is not unfair because by relying on the documents, the plaintiff is on

notice that the documents will be considered.  In re Burlington Coat Factory Securities Litig., 114

F.3d at 1426.  Nonetheless, the Court notes that in reviewing a 12(b)(6) motion "the issue is not

whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims." Id. at 1420.

The Court now will address the issue of whether Qwest had a duty of disclosure to Plaintiff.

Qwest asserts that it is further removed from the alleged NorVergence scheme than Nortel and the alleged misuse of its  trademark should not provide a sufficient basis for finding Qwest had a duty of disclosure to Plaintiff.  Qwest contends the only duty that exists related to its trademark is the duty to police its trademark for misuse in order to prevent dilution or loss of trademark status.  However, much like Nortel, the record before this Court is not sufficiently clear to rule that as a matter of law it was not plausible that Qwest owed a duty to Plaintiff.  There is an open question as to whether Qwest was aware of NorVergence's misuse of Qwest's trademark and/or tacitly approved of such misuse.  Therefore, for the purpose of deciding this motion, the Court will accept that Qwest had a duty to Plaintiff.

The following is an analysis of the individual counts against Qwest.

### Count I- Violation of the New Jersey Consumer Fraud Act

Qwest asserts that dismissal of the alleged NJCFA  violation count  is warranted because there are no allegations that Qwest made affirmative misrepresentations to the Plaintiff.  Qwest argues that Plaintiff has not alleged that Qwest authorized the use of its logo for marketing the Matrix box, that Qwest communicated with Wanland or that Quest services were included in the Matrix box telecommunication services package sold to Wanland.  Qwest Br. at 19-20.  Further Qwest asserts that even a remote supplier would only be liable if it knew and assented to the misleading use of its trademark and plaintiff here has not alleged that Qwest was a remote supplier of the Matrix Box. Id. (citing Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 226 NJ Super. 200, 211, 543 A.2d 1020 (App. Div. 1988) aff'd, 118 N.J. 249, 571 A.2d 294 (1990) ("we therefore interpret the Consumer Fraud Act to encompass the acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer"); O'Loughlin v. Nat'l Cmty. Bank, 338 NJ

84

Super. 592, 605-06, 770 A.2d 1185 (App. Div. 2001), *cert. denied* 169 NJ 606, 782 A.2d 424 (2001)).   However, the Plaintiff has indicated that they are seeking to proceed under the knowing omission category and unconscionable practices section of NJCFA violations.

Qwest contends the Consumer Fraud Act violation Count also fails because the Amended Complaint does not state a claim that Qwest knowingly omitted to disclose any material fact. Specifically, Qwest argues that there are no allegations that Qwest knew anything about the true capacity of the Matrix box.  Qwest states that a claim for knowing nondisclosure requires a finding that the defendant knew the fact that was not disclosed.  Qwest Br. at 21 (citing Peters v. US Dept. of Housing and Urban Development,  No. 04:06057 (RBK), 2006 WL 278916  (D.N.J.  Feb. 1, 2006)).  Further, Qwest argues that a remote supplier can only be liable for what it indirectly sells to the consumer and here there is no allegation that Qwest had involvement in the design, manufacture or sale of the Matrix box; Qwest is not a remote supplier; and the Complaint only alleges that Qwest sold wholesale telecommunications services to NorVergence. Id. at  22 (citing Perth Amboy Iron & Metal Co., 226 NJ Super at 210-11).  Thus, Qwest argues that Plaintiff has failed to establish a causal connection between Qwest's actions or omissions and Plaintiff's injury. Id. at 23.

Qwest also submits that it is not "vicariously liable" for the fraudulent statements or non-disclosures of NorVergence since NorVergence had neither actual nor apparent authority to speak on behalf of Qwest and NorVergence had no authority to bind Qwest under either the MRA or WSA. Id. at 23-27. Further, Qwest maintains that NorVergence's unauthorized use of the Qwest trademark did not in itself serve to "create apparent authority to bind Qwest." Id. at 26 (citing, among other cases,  Busciglio v. DellaFave, 366 NJ Super. 135, 140,  840 A.2d 897 (App. Div. 2004)). ("Apparent authority must be established clearly and convincingly by the actions of the principals,

not the alleged agent.")

However, Plaintiff does allege in the amended complaint that Qwest knowingly allowed NorVergence to utilize the Qwest logo on NorVergence's brochures and that Qwest knew or should have known that the Matrix boxes could not perform in the manner described in the brochures and further that Qwest omitted to disclose that information. Complaint ¶¶ 27, 32, 35. Plaintiff alleges that Qwest had knowledge of the true value of the Matrix boxes and that the presence of the Qwest logo on NorVergence's brochure induced Plaintiff to sign the equipment leases thereby establishing causation. Plaintiff also argues that Qwest's profits increased as a result of the equipment leases. At this stage in the proceeding it is not clear exactly what Qwest knew concerning the alleged NorVergence fraud which involved the Qwest name and logo and whether Qwest tacitly approved or actively engaged in the allegedly fraudulent scheme. The Court is satisfied though that Count I as pled with regard to Qwest does present a claim that is plausible on its face. Based on the record before the Court and taking all reasonable inferences in favor of the Plaintiff, as the non-moving party, the Court denies Qwest's motion to dismiss with respect to Count I.

*Count II - Negligent Misrepresentation*

Qwest asserts the Amended Complaint fails to describe any statement made by Qwest to Plaintiff, false or otherwise. Qwest Br. at 28. Qwest argues that Plaintiff failed to assert a claim for negligent misrepresentation because the amended complaint does not allege any direct communication between Qwest and the Plaintiff and that Qwest did not have a duty to disclose and thus could not be liable for a negligent failure to disclose. Id. (citing Karu v. Feldman, 119 N.J. 135, 148, 574 A.2d 420 (1990)).

As discussed above, for purposes of this motion the Court accepts that Qwest did have a duty to disclose. It has also been alleged that Plaintiff and class members were induced to sign equipment

leases that contained false, material information in NorVergence's brochure which contained Qwest's logo. Viewing the record as a whole it appears dismissal at this stage of the proceeding would be premature. Plaintiff has put forth sufficient plausible allegations with which to proceed in a claim for negligent misrepresentation. There are still open questions as to whether Plaintiff and the putative class members did in fact rely on the Qwest logo and name and whether Qwest knew or should have know about such reliance. However, accepting the allegations as true for purposes of this motion and taking all reasonable inferences in favor of the Plaintiff, this Court shall deny Qwest's motion to dismiss Count II of the amended complaint.

### Count III - Unjust Enrichment

 Qwest argues, citing VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994), that the Plaintiff's unjust enrichment claim should be dismissed because, in short, the Plaintiff has not shown that Qwest was unjustly enriched. Specifically, according to Qwest, the Amended Complaint, does not allege facts that if proven would evidence that Qwest profited directly or indirectly. Id. at 29. Further, the Amended Complaint does not allege that Qwest received proceeds from the equipment leases, provided NorVergence with Matrix boxes, nor sold telecommunications services to Plaintiff. Qwest posits that at most the Amended Complaint alleges that Qwest sold wholesale telecommunications services to NorVergence; however, there is no allegation that NorVergence sold those services to Plaintiff. Id. Qwest describes itself as merely a wholesale provider to NorVergence who, as its bankruptcy proof of claim reveals, has also been injured and left unpaid by NorVergence for "tens of millions of dollars of services Qwest supplied to NorVergence". Id. at 30.

Plaintiff has countered that their complaint alleges Qwest's profits increased when NorVergence's sales went up because NorVergence paid Qwest for telecommunications services.

As to the claim for unjust enrichment there are open questions as to whether or not a benefit was conferred from Plaintiff and class members to NorVergence and in turn later transmitted to Qwest. Accepting for purposes of this motion that a benefit was conferred, it is plausible for Plaintiff to maintain a claim for unjust enrichment. As such, dismissal of Count III at this stage of the proceedings with a limited record would be premature. Plaintiff has alleged sufficient information to be entitled to put forth evidence to substantiate its claims. As such Qwest's motion to dismiss is denied with respect to Count III.

Next, the Court will address Qwest's argument that the Amended Complaint fails to meet the standards of Fed. R. Civ. P. 9(b). The Court finds that the Amended Complaint contains allegations that 1) clearly identify the parties (Complaint ¶¶ 8-14); 2) provide a detailed description of the alleged fraud (Complaint ¶¶ 24-46); 3) state Qwest's participation in the allegedly fraudulent scheme (Complaint ¶¶ 16-20, 27, 32); and 4) identify certain specific information plaintiff contends should have been disclosed. (Complaint ¶¶ 37, 38). <u>See</u> *supra* notes 5-7. Thus, similar to the Court's determination regarding Nortel stated above, the Court finds that the fraud counts in the Amended Complaint have been pled with sufficient particularity and the Amended Complaint meets the standards of Rule 9(b). <u>See</u> <u>NN&R, Inc. V. One Beacon Ins. Group</u>, 362 F. Supp. 2d 514, 518 (D. N.J. 2005); <u>Christidis v. First Penn. Mortgage Trust</u>, 717 F.2d 96, 99-100 (3d Cir. 1983).

However, as stated previously, to the extent additional documents, such as those referenced herein, have become available after the filing of the Amended Complaint and the allegations are capable of being stated with greater particularity, the Court directs Plaintiff to further amend the complaint within 30 days of the date of this Opinion.

The Court will now address Fine's motion for summary judgment.

**C.    Fine's Motion for Summary Judgment**

88

Federal Rule of Civil Procedure 56(c), made applicable to this proceeding under the Federal Rule of Bankruptcy Procedure 7056, provides that a court shall grant summary judgment "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." In reviewing a summary judgment motion, the role of the court "is not to weigh evidence, but to determine whether there is a genuine issue for trial." Knauss v. Dwek, 289 F. Supp. 2d 546, 549 (D.N.J. 2003) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986)).

The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Co., 812 F.2d 141, 144 (3d Cir. 1987). The burden then shifts to the non-moving party to "make a showing sufficient to establish the existence of [every] element essential to the party's case, and on which that party will bear the burden of proof at trial." Cardenas v. Massey, 269 F.3d 251, 254-55 (3d Cir. 2001) (quoting Celotex Corp., 477 U.S. at 322). Inferences and facts should be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Landtech Corp. v. State Mut. Life Assurance Co. of America, 605 F.2d 75, 79 (3d Cir. 1979).

Nevertheless, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." U.S. v. Anthony Dell'Aquila, Enters. and Subsidiaries, 150 F.3d 329, 332 n.2 (3d Cir.1998) (quoting Anderson, 477 U.S. at 247-48). An issue of fact is

"genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving

party.  Anderson, 477 U.S. at 248.   A fact is "material" if it might affect the outcome of the suit

under the governing substantive law.   Anderson, 477 U.S. at 248.  Thus, the motion for summary

judgment will not be defeated by disputes over irrelevant or unnecessary facts.  Id.

Summary judgment may be proper even when material facts remain disputed, if, after all

inferences are drawn in favor of the non-moving party, the moving party is entitled to judgment as

a matter of law.  Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999).  A judgment "as

a matter of law" is appropriate when the non-moving party has failed to satisfy the burden of proof

of adequately demonstrating an essential element of his or her case. Id.  at 806.  Alternatively, a

court must deny a summary judgment when a genuine issue of material fact remains to be tried, or

when the moving party is not entitled to a judgment as a matter of law.

In the present case, Plaintiff opposes Fine's motion for summary judgment, in part, because

Plaintiff has not had a reasonable opportunity to conduct discovery in the present matter, and as a

result, is prejudiced in its ability to respond to Fine's motion for summary judgement.  Federal Rule

of Civil Procedure 56(f) addresses cases where a non-movant opposes summary judgment on the

grounds that additional discovery is required, and provides:

> Should it appear from the affidavits of a party opposing the motion that the party
> cannot for reasons stated present by affidavit facts essential to justify the party's
> opposition, the court may refuse the application for judgment or may order a
> continuance to permit affidavits to be obtained or depositions to be taken or
> discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  In deciding whether to allow a continuance of a motion for summary judgment

in order to allow the non-movant to conduct discovery, courts have discretion to determine whether

the summary judgment is "ripe for resolution" and when additional discovery is needed  the non-

moving party should move for a continuance or other relief.  Lorenzo v. Griffith, 12 F.3d 23, 27 n.

5  (3d Cir. 1993) ("When a nonmoving party urges the district court to forestall consideration of a summary judgment motion in order to facilitate discovery, Fed.R.Civ.P. 56(f) affords the district court a measure of discretion in determining whether the summary judgment motion is ripe for resolution. Under accepted practice, when additional discovery is needed, a Rule 56(f) motion should be filed, explaining why opposing affidavits are unavailable.").  Whether a motion should be granted under Federal Rule of Civil Procedure 56(f) "depends in part on 'what  particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained.'"  <u>Contractors Ass'n of Eastern Pennsylvania, Inc., v. City of Philadelphia</u>, 945 F.2d 1260, 1266 (3d Cir. 1991) (quoting <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 140 (3d Cir. 1988)).  Furthermore, motions for a continuance of a motion for summary judgment for discovery purposes are ordinarily granted as a matter of course if the information concerning the facts to be discovered is solely in possession of the party moving for summary judgment.  <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 432 (3d Cir. 1994), *cert. denied*, 513 U.S. 1082 (1995)("A district court has discretion in acting on Rule 56(f) motions... However, where relevant information sought is in the hands of the moving party, 'a district court should grant a Rule 56(f) motion almost as a matter of course unless the information is otherwise available to the non-movant'."); <u>Costlow v. U.S.</u>, 552 F.2d 560, 564 (3d Cir. 1977) (holding that under Fed. R. Civ. P. 56(f), "where the facts are in possession of the moving party a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course").

As discussed above, Fine asserts that his motion for summary judgment must be granted because the Plaintiff has failed to demonstrate that there are any genuine material issues of fact regarding the term of Fine's employment with NorVergence, the date of the equipment lease which gave rise to Plaintiff's claims against Fine, the lack of Fine's involvement with the sale and

91

marketing of NorVergence's telecommunications products to consumers, Fine's noninvolvement

with the development of the NorVergence business plan, Fine's role as Director of Bank Relations

and the fact that Fine was not an officer of NorVergence nor a member of NorVergence's Board of

Directors.  Based on the record before this Court, Fine asserts that he cannot be liable for any of the

counts in the Plaintiff's Amended Complaint and therefore summary judgment should be granted

as a matter of law.  In support of his position Fine asserts that he was employed by NorVergence

from April 2003 until June 2004 and that the equipment lease giving rise to the named Plaintiff's

putative claims was executed before the start of Fine's employment.  As such, Fine claims there is

no way that he could have violated the NJCFA or committed negligent misrepresentation.

Furthermore, Fine asserts that there is no need to permit the Plaintiff to conduct discovery because

"no amount of discovery will create a cause of action against Defendant Fine when none exists."

As such, Fine contends that as a matter of law summary judgment must be granted in favor of Fine

dismissing Plaintiff's amended complaint.

According to the record, Plaintiff has not had the opportunity to conduct discovery.  As such,

Plaintiff has been prejudiced in its ability to respond to Fine's motion for summary judgment and

should be afforded an opportunity to at least conduct the relevant discovery necessary to respond

to Fine's motion.

Although, Fine dismisses Plaintiff's responsive pleadings as procedurally defective for not

being based on personal knowledge, Plaintiff, as previously stated,  has not had the opportunity to

conduct discovery and hence Plaintiff would be unable to provide a Fed.R.Civ.P. 56(e) affidavit with

the degree of specificity that is required.  Plaintiff attested to this fact in its Fed.R.Civ.P. 56(f)

affidavit.  See Rodiriguez Decl., Ex. A.;   Fed.R.Civ.P. 56(f) Aff. of William R. Kane, Esq.

Likewise, the fact that the NorVergence Press releases that Plaintiff submitted as exhibits to the

Declaration in Opposition arguably may not contradict the statements in Fine's Certification does not serve to clarify pending issues of material fact regarding the term of Fine's employment, his job responsibilities and his interaction with other NorVergence executives. Rather, it serves to reinforce the point that without allowing the Plaintiff relevant discovery, the record before this Court is not sufficient to rule as a matter of law that all of the Plaintiff's claims should be dismissed.

The record is not fully developed enough to either grant or deny Fine's motion for summary judgment. For example, Fine states in his certification in support of his motion to dismiss that he was not a director or officer of NorVergence, that he was not involved in sales to consumers of NorVergence's telecommunications products and services, including the sales made to Plaintiff Wanland & Associates, Inc., that no NorVergence personnel reported to him and that Fine never attended a Board of Directors Meeting. However, Fine also states that he served as Director of Bank Relations for NorVergence and that he was to be named as President of NorVergence Capital LLC. It is unclear from the record whether Norvergence staff would report to one operating in the capacity of Director of Bank Relations. Although, NorVergence Capital LLC did not launch because of NorVergence's bankruptcy filing, it is also unclear whether or not Fine, as the soon to be named President of that entity, had any interactions with NorVergence Officers or Directors in preparation for the launch of NorVergence Capital LLC. As the Third Circuit has noted "[i]t is a first principle of federal civil procedure that litigants 'are entitled to discovery before being put to their proof.'" See Alston v. Parker, 363 F.3d 229, 233, n.6 (3d Cir. 2004)(quoting Bennett v. Schmidt, 153 F.3d 516, 519 (7th Cir. 1998) In light of the foregoing, the Court shall issue a continuance in accord with Rule 56(f) to allow Plaintiff to conduct such discovery as is necessary for the purpose of responding to Fine's motion for summary judgment. After conducting such discovery, this Court will again consider the subject motion for summary judgment.

An order shall be submitted in accordance with this Opinion.

_Rosemary Gambardella_
ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE

Dated:   February 28,  2008